1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PILLSBURY WINTHROP SHAW PITTMAN LLP
AARON S. DYER (SBN: 161798)
KIMBERLY D. JAIMEZ (SBN: 271235)
CASSANDRA N. LOVE (SBN: 342723)
725 South Figueroa Street, 36th Floor
Los Angeles, CA 90017-5406
Telephone:      213.488. 7321/3637
Facsimile:      213.226.4138
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

BASE MEDIA TECHNOLOGY GROUP
LIMITED, *a Hong Kong Corporation*
                    Plaintiff,

        vs.

REMINGTON "BILL" CHASE, *an
individual*; KEVIN ROBL, *an individual;*
PRODUCTION CAPITAL CORP*., a
California corporation*; PRODUCTION
CAPITAL LLC, *a Delaware limited
liability company*; PRODUCTION
CAPITAL ENTERTAINMENT, INC., *a
California corporation*; PRE
PRODUCTION CAPITAL LLC, *a
Delaware corporation*; PRODUCTION
CAPITAL LEGACY PARTNERS, LP, *a
Delaware limited partnership*; FRIENDS
OF PRODUCTION CAPITAL, *a
Delaware limited liability company*;
FRIENDS OF PRODUCTION CAPITAL
II, LLC., *a Delaware limited liability
company*; THE PRODUCTION HOUSE
LTD*., a Colorado corporation*;
PRODUCTION HOUSE OF CINEMA,
INC., *a California corporation*;
PRODUCTION HOUSE
INTERNATIONAL, LLC, *a Wyoming
Limited Liability Company*;

Case No. 2:22-cv-01954

**COMPLAINT FOR:**
**(1)  Fraud**
**(2)  Fraudulent Inducement**
**(3)  Trade Name Infringement**
**(4)  Trade Libel**
**(5)  Breach of 2019 Loan Agreement**
**(6)  Breach of December 2019
        Agreement**
**(7)  Civil Conspiracy**
**(8)  Declaratory Judgment**

**JURY TRIAL DEMANDED**

KNIGHTSBRIDGE ENTERTAINMENT INC., *a Colorado corporation*; CHASING AIR, INC., *a California corporation*; BASE FXD ART PRODUCTION LLC., *a United Arab Emirates limited liability corporation*; BASE FX, INC., *a Colorado corporation*; BASE PRODUCTIONS TRINIDAD, *a Trinidad corporation*; and DOES 1-50, *inclusive*.

Defendants.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION............................................................................1

JURISDICTION AND VENUE......................................................10

PARTIES.........................................................................................11

    I.    Plaintiff.................................................................11

    II.   Defendants.............................................................11

        A.   Individuals...................................................11
        B.   Production Capital & Affiliated Entities.................11
        C.   The Fake Base Entities....................................13
        D.   Alter Ego Allegations.....................................13

FACTUAL ALLEGATIONS.............................................................14

    I.    THE FRAUDULENT SCHEME.....................................14

        A.   Defendant Chase Was Introduced as an "Elite" Hollywood Financier..................................................15
        B.   Defendant Chase Earned Base's Trust with Dependable Financing..................................................15
        C.   Malaysian Studio Partnership Generated Greater Financing Needs.......................................................16
        D.   Defendants Deepened Their Relationship with Base................17
        E.   Defendants Began Initiating Wires from Various Parties..........18
        F.   Defendants Committed to Further Financing While Obscuring Their Fraudulent Fundraising.................................19
        G.   Alternative Funding Pursued...............................19

    II.   DISCOVERY OF THE FRAUD.....................................22

        A.   Defendants Formed the Singapore Fund to Funnel Fraudulently Obtained Funds to One of Their Fake Base Entities.................23
        B.   Defendants' Forged Agreements Emerge.............................25
        C.   Extreme Example of Defendants' Fraudulent Dealings.............27

    III.  DEFENDANTS CAUSED HARM TO BASE THROUGH THEIR FRAUDULENT SCHEME........................................30

FIRST CLAIM FOR RELIEF........................................................31

SECOND CLAIM FOR RELIEF....................................................35

THIRD CLAIM FOR RELIEF ............................................................................. 38

FOURTH CLAIM FOR RELIEF ......................................................................... 39

FIFTH CLAIM FOR RELIEF ............................................................................. 40

SIXTH CLAIM FOR RELIEF ............................................................................. 41

SEVENTH CLAIM FOR RELIEF ....................................................................... 42

EIGHTH CLAIM FOR RELIEF .......................................................................... 43

PRAYER FOR RELIEF ...................................................................................... 44

# COMPLAINT

Plaintiff Base Media Technology Group Limited, by counsel, hereby states its complaint against Defendants Remington "Bill" Chase ("Defendant Chase"); Kevin Robl ("Defendant Robl"); Production Capital Corporation; Production Capital, LLC; Production Capital Entertainment, Inc.; Friends of Production Capital; Friends of Production Capital II, LLC; Pre Production Capital, LLC; Production Capital Legacy Partners (collectively, "Defendant Production Capital"); The Production House, Ltd.; Production House of Cinema, Inc.; Production House International, LLC (collectively, "Production House"); Knightsbridge Entertainment, Inc. ("Knightsbridge"); Chasing Air, Inc. ("Chasing Air"); Base FXD ART Production, LLC.; Base FX, Inc.; Base Productions Trinidad (collectively, the "Fake Base Entities", and each individually a "Fake Base Entity"); and DOES 1-50, inclusive (each individually a "Defendant" and collectively "Defendants"), as follows:[1]

# INTRODUCTION

1.     For the last nine years, Defendant Remington Chase and Defendant Kevin Robl engaged in a complex scheme to defraud their investors, claiming that the funds they raised would be used to finance film projects by Plaintiff Base Media Technology Group Limited ("Base"), when in fact they were siphoning off most of the funds for their own use. They spent several years cultivating a business and personal relationship with Base and its CEO by falsely representing to Base their character, their contacts, and their intentions, so that they could convince their investors that Base was actually involved in their investments. Once they had garnered Base's trust, they misappropriated Base's name, (i) forging loan agreements and investment agreements and signatures of Base agents, including Base's CEO, (ii) creating fake Base email accounts, (iii) creating fake Base entities, (iv) opening bank accounts on behalf of those fake Base entities, and (v) directing funds they were purportedly raising for Base to

---

[1] All allegations contained herein are based on personal knowledge, unless specifically stated to be based upon information and belief.

themselves, without Base's authorization. As a result, Base was defrauded out of an ownership interest in the company, film assets, funding for its projects, $500,000 in cash, and has suffered and is continuing to suffer significant harm to its reputation.

2.     This, however, was not the first time Defendants engaged in such artifice. Base discovered that Defendant Chase spearheaded a similar fraudulent scheme during the same time period, using his entity Defendant Knightsbridge Entertainment, Inc. ("Knightsbridge"). In 2020, the United States Securities and Exchange Commission ("SEC") charged Defendant Chase with fraudulently misappropriating millions of dollars from investors by selling over $62 million in high-yield, short-term promissory notes, claiming the funds would be used for film financing, when Defendant Chase in fact used much of the money for personal use. In October 2020, Defendant Chase consented to a permanent injunction barring him from violating the charged provisions and requiring him to repay more than $10 million.[2] Throughout his dealings with Base, Defendant Chase failed to disclose his fraudulent activities involving Knightsbridge, the SEC's investigation, or the existence of the permanent injunction. Instead, Defendant Chase and his business partner, Defendant Robl, used this same model to defraud Base as well as investors and lenders eager to finance Base.

3.     Defendants targeted a company—Plaintiff Base—with a stellar reputation to use that standing as a front for their investment fraud. They would prove themselves with successful transactions to encourage deeper ties and propose acquisitions of assets that would never come to fruition to gain confidential information about their targets. Prior to dealing with Defendants, Base had developed name recognition in the film

---

[2] *See* Complaint, Case No. 2:20-cv-08343 (C.D. Cal. September 11, 2020) (containing allegations that Defendant Chase raised millions for post-production film financing, when in fact Chase used the funds for personal expenses without disclosure to investors); *see also* Final Judgment as to Defendant Remington Chase a/k/a William Westwood a/k/a William Elliot, Case No. 2:20-cv-08343 (C.D. Cal. October 5, 2020) (ordering Defendant Chase to pay $10,120,778 and enjoining him from further violations of SEC regulations and statutes).

industry as it grew from a small, self-financed visual effects startup into one of the leading studios in Asia. Base's rise in the industry was substantiated by its strategic alliance agreement with Industrial Light & Magic ("ILM") in May 2012.  In an effort to further expand in 2013, Base sought financing to enhance its special effects business and to venture into the production of full feature live-action and animation films. Highly influential and respected individuals in Hollywood introduced Base's CEO to Defendant Chase as a proven and successful financier in the film industry, and potential funding source for Base's development.  Base's agency, United Talent Agency ("UTA"), one of the three major entertainment agencies in Hollywood, presented Defendant Chase to Base's CEO to discuss potential financing for Base. Two years later, Defendant Chase introduced Base's CEO to the CEO of Film Finances, Inc. ("FFI CEO", and Film Finances, Inc., "FFI"), one of the largest bonding companies in the world. The FFI CEO similarly vouched for Defendant Chase, representing to Base's CEO that he had been working on film financing deals with Defendant Chase for years and had formed both an excellent business relationship as well as a friendship. These recommendations impressed upon Base's CEO that Defendant Chase was someone who could be trusted to obtain financing in an industry where competition for funding was strong.

4.      In what was the epitome of the "long con," Defendant Chase and his partner Defendant Robl spent the next four years cultivating the relationship and attempting to persuade Base to do business with them. Unbeknownst to Base, Defendant Chase's and Defendant Robl's true plan was entirely different. They were scheming to falsely use and misappropriate Base's name in order to raise funds *for their own use*, not just for Base's. Only years later, when Base began seeing documents bearing forged signatures falsely purporting to be signed by representatives of Base, did Base begin to learn the depths of Defendants' deception.

5.      Defendants' apparent accomplishments during this time only increased Base's confidence.  Defendant Chase reportedly provided financing to productions like

*Broken City* starring Mark Wahlberg and Russell Crowe, *The Frozen Ground* starring Nicholas Cage and John Cusack, *Empire State* starring Dwayne Johnson, *Escape Plan* starring Sylvester Stallone and Arnold Schwarzenegger, and *Some Kind of Beautiful* starring Pierce Brosnan, Selma Hayek, and Jessica Alba.

6.      Correspondingly, Defendants made their own introductions to further gain Base's confidence. Defendant Chase invited Base's CEO to his private hangar at the Hawthorne Airport in Hawthorne, California, and introduced him on a first name basis to Tesla and SpaceX CEO billionaire Elon Musk, his neighbor from the next hangar, while discussing with Musk what appeared to be ongoing business dealings.[3] On another occasion, Defendant Chase flew Base's CEO in his helicopter to have lunch at Kevin Costner's house, where Costner met them on his lawn as the helicopter landed.

7.      Similarly, Defendant Chase vouched for Defendant Robl, who claimed he was a script writer and producer, and was nominated by former President Trump to be "a Member of the President's Advisory Committee on the Arts of the John F. Kennedy Center for the Performing Arts." Robl touted this Trump connection in his fundraising efforts. This appointment apparently followed donations by Defendant Robl and Maria Robl of $50,000 each.



[Source: https://www.youtube.com/watch?v=V1bonA1YLFc]. The biography of Defendant Robl also touted his role at Knightsbridge, where he claimed to have

---

[3] Defendants were later sued by entities affiliated with the Hawthorne hangar in 2021 alleging that they borrowed funds and then improperly took them for personal use. *See Hawthorne Hangar Operations, LP, et al. v. Production Capital, LLC, et al.*, Case No. 21STCV39700 (Super. Ct. Cal. October 28, 2021).

-4-

"developed, financed, and produced motion pictures," and that he "leveraged the model developed at Knightsbridge to found the premier film lending company Defendant Production Capital LLC"—the entity that was used to transact business with Base. Of course, as the SEC discovered, that "model" he was leveraging was akin to a Ponzi scheme. *See supra*, n. 2.

8.     In 2017, after four years of such actions engendering trust, Base's CEO finally decided to work with Defendant Chase as a funding source for its business. Base agreed to partner with Defendant Chase in a joint venture, whereby Defendant Chase would fund the building and operations of a new visual effects studio in Malaysia (the "Malaysian Studio") in exchange for 46% equity in that venture. Defendant Chase represented that he had the resources to provide the funding. When funding slowed, Defendant Chase indicated that any additional funding would be easily obtained through third-party loans taken out by Defendant Chase's company, Defendant Production Capital.

9.     Defendant Chase extended bridge financing to Base for a motion picture project in 2017. Base repaid these loans as agreed, and nothing about the transactions seemed unusual or improper.

10.     Base continued this seemingly mutually beneficial financing and funding relationship for several years. These business transactions, however, gave Defendants intimate knowledge of Base's business operations. Unbeknownst to Base, Defendants would later exploit this knowledge and their connection to Base to deceive potential investors and lenders.

11.     Defendant Chase and Defendant Robl likewise deceived Base about the source of the loans and their relationship with investors and lenders. For example, Defendant Chase and Defendant Robl routinely told Base's CEO that Defendants' financial arrangements with their investors did not contractually involve Base.

12.     Base has now become aware that these representations were false. The agreements Defendants were executing with their investors and lenders purported to

involve Base, even though Base had not authorized or consented to these agreements. Some of the transactions even involved a list of phony film projects that Base was not involved with. Base has since uncovered that Defendant Chase and Defendant Robl entered into countless fraudulent agreements executed with forged signatures— agreements that purported to sell Base's property and equity interests in various Base projects or listed Base's assets as security.

13.    While still unaware of the fraud at the end of 2019, Base entered into a series of agreements with Defendant Chase that were meant to create a schedule of Defendants' prior funding sent to Base both for Base's productions, and for the Malaysian Studio's building and operating costs.[4] Because Defendant Chase and Defendant Robl told Base that Base had no obligation to any underlying lenders— Defendant Chase and Defendant Robl convinced Base to give Defendant Chase (i) equity in Base, (ii) cash, and (iii) a portion of a film revenue stream in exchange for forgiving a portion of Base's debt. Base had no idea that Defendant Chase's representations were lies, and that other parties would soon surface demanding money from Base based on forged agreements.

14.    In late 2020 and continuing through 2021, pieces of Defendants' fraudulent scheme began to emerge. Base's CEO began hearing from individuals claiming they had either loaned money to or had directly invested in Base, and that they were owed money from Base. Base, however, had not been a part of—or even heard of—any of these transactions. And, while these parties could have easily determined that Base was not involved in the agreements they were signing by simply calling Base to verify, they did not do so, perhaps because, on information and belief, many of them had engaged in highly profitable business transactions with Defendant Chase and Defendant Robl,

---

[4] While startups will often use new financing to repay founder capital initially invested in the company, with Base that did not occur. Additionally, the Base CEO frequently opted out of salary payments and never took a net profit distribution during this period.

1  earning above-market interest rates or investment returns, before Base's name was ever
2  involved.

3      15.    When Base's CEO questioned Defendant Chase and Defendant Robl about
4  these inquiries, they claimed there was a misunderstanding and that they would take
5  care of it. For a while, these issues appeared resolved because Base's CEO did not hear
6  back from those individuals.

7      16.    In late 2021, the true extent and nature of the fraud came to light. Base's
8  CEO received additional inquiries, this time accompanied by copies of documents that
9  bore forged signatures falsely purporting to be the Base CEO's (or another purported
10 Base agent's), and showing that money had been transferred to fake Base entities with
11 fake Base bank accounts. Those forged contracts often purported to sign away Base's
12 equity in its productions, percentages of its revenue streams, and/or provided an interest
13 in Base's assets as security.

14     17.    As is evident from comparing the signatures below, the signatures that
15 purported to be from Base's CEO were forgeries.



| **Compare:** |
| --- |
| *The Base CEO's Authentic Signature*: |
| BASE MEDIA TECHNOLOGY GROUP LIMITED [5]<br>Signature:<br>Name / Title: CHRIS BREMBLE CEO / DIRECTOR |
| **With:** |
| *Forged Agreements with the Singapore Fund Manager/Base Media Capital Singapore and/or the Singapore Fund Manager's investors and lenders*: |
| Base Media Technology Group, Ltd [6]<br>Signature<br>Chris Bremble<br>Name<br>30the Jan 2019<br>Its |

---

[5] *See* 2019 Loan Agreement by Base and Defendant Chase, November 26, 2019 ("2019 Loan Agreement"), attached hereto as Exhibit A.

[6] *See* Investment Agreement by Kings Offer Pte, Ltd. ("Kings Offer") and Base, January 28, 2019 ("Kings Offer/Wish Dragon Agreement"), attached hereto as Exhibit B.

*Forged Agreement with Julius Wang:*[7]

*Forged Agreements with Cambridge Sarnano:*[8]

*Forged Agreements with Joseph Tang and/or his investors and lenders:*[9][10][11][12][13][14]

---

[7] *See* Loan & Security Agreement by Base FX International Limited ("Base International") and Base, October 4, 2019.

[8] *See* First Amended Revolving Credit Facility Agreement by Base, Shanghai Base Culture Media Co., Ltd., Base Animation Malaysia, Base Technology Group Limited, and Cambridge Sarnano, Ltd.

[9] *See* Investment Agreement by Man Kit Chiang and Base Digital Services, Ltd. ("Base Digital"), December 23, 2020.

[10] *See* Investment Agreement by Richard Chung and Base Digital, December 23, 2020.

[11] *See* Investment Agreement by City 168 Limited and Base Digital, December 23, 2020.

[12] *See* Investment Agreement by Cary Kuo and Base Digital, December 23, 2020.

[13] *See* Investment Agreement by Charlene Luo & Cheng Chun Chun and Base, January 8, 2021.

[14] *See* Guaranty Agreement by Charlene Luo & Cheng Chun Chun and Base, January 8, 2021.

*Forged Agreements with Vanessa Guo/Gosdom and/or Vanessa Guo's investors and lenders:*

18.     In addition to the fake Base entities and bank accounts, Base learned that Defendants had been using spoofed Base email accounts, mimicking Base email accounts, to communicate with investors. Upon information and belief, Defendants had a separate person, unaffiliated with Base, impersonate the Base CEO on investor calls. Additionally, Defendants sent memos with forged signatures to investors purporting to

---

[15] *See* Loan & Security Agreement by Gosdom, Inc. and Base FX, June 21, 2019.

[16] *See* Investment Agreement by Zhi Hui Weng and Base, January 30, 2019.

[17] *See* Investment Agreement by Yao Chang Chen and Base, January 30, 2019.

[18] *See* Loan & Security Agreement by Gosdom, Inc. and Base FX, June 26, 2019.

[19] *See* Investment Agreement by Gosdom Entertainment, Inc. and Base, January 28, 2019.

[20] *See* Loan & Security Agreement by Gosdom, Inc. and Base FX, May 31, 2019.

[21] *See* Investment Agreement by Gosdom Entertainment, Inc. and Base, January 28, 2019.

[22] *See* Investment Agreement by Gosdom Entertainment, Inc. and Base, January 28, 2019.

[23] *See* Loan & Security Agreement by Gosdom, Inc. and Base, May 1, 2019.

[24] *See* Investment Agreement by and between J.C. and Base, January 29, 2019.

be authored by Base's CEO. Defendants even set up an unauthorized Base office, bearing Base's logo, located in Pasadena, California.

19.     Defendant Chase and Defendant Robl apparently used those fake Base entities, communications, and bank accounts to induce outsiders to invest in or loan funds to those entities, and to lull those outsiders into believing that they were contracting with Base and would eventually be repaid. None of the transactions described in the forged documents was ever authorized by Base.

20.     When the Base CEO confronted Defendant Chase about a forged document, Defendant Chase admitted that Defendants had created the forged document, and assured Base's CEO that Defendants would repay all funds owed to investors. Base has since learned, however, that Defendants have not repaid all their investors or lenders and continue to raise funds by wrongfully claiming to be affiliated with Base. Several of those investors have demanded that Base recognize its purported obligations to them under various purported contracts that Base never signed. Defendants' misconduct, as alleged above and further detailed below, has caused Base significant financial harm, reputational damage, and has forced Base to defend itself in expensive litigation proceedings.

21.     Base brings this action to stop Defendants from using Base's name and likeness for any purpose whatsoever, to stop Defendants' fraudulent scheme, and to recover the damages Defendants have caused to Base.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) based on complete diversity of citizenship between Plaintiff and Defendants. The amount in controversy exceeds $75,000.

23.     Venue is proper in this judicial district pursuant to 18 U.S.C. § 1391 as this court has personal jurisdiction over all Defendants and multiple Defendants reside in or have their principal place of business in Los Angeles County, California.

24.     This Court also has jurisdiction under the Court's supplemental jurisdiction as provided in 28 U.S.C. § 1367.

## PARTIES

### I.   PLAINTIFF

25.     Plaintiff Base Media Technology Group Limited is a Hong Kong Corporation with its principal place of business in China. Plaintiff has offices in Beijing, Xiamen, and Wuxi in China, and Kuala Lumpur in Malaysia.

### II.   DEFENDANTS

#### A.   Individuals

26.     Upon information and belief, Defendant Remington "Bill" Chase is a United States citizen who at all times relevant herein, was an individual residing in Los Angeles County, California, but who upon information and belief maintains residences both in Los Angeles, California and London, England. Together with Defendant Robl, Defendant Chase is an owner and operator of each of the other Defendants.

27.     Upon information and belief, Defendant Kevin Robl is a United States citizen who is domiciled in Los Angeles, CA, and together with Defendant Chase is an owner and operator of each of the other Defendants.

#### B.   Production Capital & Affiliated Entities

28.     Defendant Production Capital Corporation is a California corporation formed on or about May 16, 2018. Upon information and belief, its principal place of business is located at 3511 Jack Northrop Ave., Hawthorne CA 90250. This entity was voluntarily dissolved on or around April 1, 2020.

29.     Defendant Production Capital, LLC is a Delaware limited liability company, formed on or about April 21, 2017. Upon information and belief, its principal place of business is located at 6411 Ivarene Ave., Los Angeles CA 90068.

30.     Defendant Production Capital Entertainment, Inc. is a California corporation formed on or about October 11, 2018. Upon information and belief, its principal place of business is located at 3511 Jack Northrop Ave., Hawthorne CA

Case No:  2:22-CV-01954

90250. This entity was forfeited by the Franchise Tax Board on or about January 3, 2022.

31.     Defendant Pre Production Capital, LLC is a Delaware corporation formed on or about December 1, 2017. Upon information and belief, its principal place of business is located at 515 Figueroa St., 16th Floor, Los Angeles CA 90071.

32.     Defendant Production Capital Legacy Partners Fund, LP, is a former Delaware limited partnership formed on or about January 23, 2019. Upon information and belief its principal place of business was located at 6411 Ivarene Ave., Los Angeles CA 90068. Defendant Production Capital Legacy Partners Fund, LP filed a Certificate of Cancellation of Limited Partnership on or about June 2, 2021.

33.     Defendant Friends of Production Capital, LLC is a Delaware limited liability company formed on or about November 7, 2018. Upon information and belief, its principal place of business is located at 6411 Ivarene Ave., Los Angeles CA 90068.

34.     Defendant Friends of Production Capital II, LLC is a Delaware limited liability company formed on or about February 7, 2019. Upon information and belief, its principal place of business is located at 6411 Ivarene Ave., Los Angeles CA 90068.

35.     Defendant Knightsbridge Entertainment, Inc. is a Colorado corporation formed on or about January 23, 2018. Upon information and belief, its principal place of business is located at 30765 Pacific Coast Hwy, Ste. 369, Malibu CA 90265.

36.     Defendant The Production House Ltd. is a Colorado corporation formed on or about April 4, 2017. Upon information and belief, its principal place of business is located at 30765 Pacific Coast Hwy, Ste. 369, Malibu CA 90265. The corporation was voluntarily dissolved on or about February 18, 2020.

37.     Defendant Production House of Cinema, Inc. is a California corporation formed on or about July 14, 2017. Upon information and belief, its principal place of business is located at 4182 N. Viking Way, Long Beach CA 90808. A Certificate of Dissolution was filed on or about July 19, 2018.

38.     Defendant Production House International, LLC is a Wyoming limited

-12-

liability company formed on or about December 6, 2018. Upon information and belief, its principal place of business is located at 3507 Jack Northrup Ave., Hawthorne CA 90250. A Certificate of Dissolution was filed on or about May 12, 2020. Defendant Production House International, LLC then reactivated on or about February 25, 2021, before filing another Certificate of Dissolution on or about December 5, 2021.

39.     Defendant Chasing Air, Inc. is a California corporation formed on or about April 18, 2017. Upon information and belief, its principal place of business is located at 30765 Pacific Coast Highway, Ste. 369, Malibu CA 90265. This entity was suspended by the Franchise Tax Board on or about March 11, 2021.

**C.     The Fake Base Entities**

40.     Defendant Base FXD ART Production, LLC is a United Arab Emirates limited liability company formed in Dubai, UAE. Upon information and belief, its principal place of business is located in Deira Dubai, UAE.

41.     Defendant Base FX, Inc. is a Colorado corporation formed on or about May 1, 2018. Upon information and belief, its principal place of business is located at 30765 Pacific Coast Hwy, Ste. 369, Malibu CA 90265. The entity was voluntarily dissolved on or about February 27, 2020.

42.     Defendant Base Productions Trinidad is a Trinidadian company that upon information and belief has its principal place of business located at Level 2, #49 Dundonald Street, Port of Spain, Trinidad & Tobago.

**D.     Alter Ego Allegations**

43.     At all relevant times, each Defendant acted as an agent, servant, employee, co-conspirator, alter-ego and/or joint venturer of the other Defendants, and in doing the things alleged herein acted within the course and scope of such agency, employment, alter-ego and/or in furtherance of the joint venture. Each of the Defendants' acts alleged herein was done with the permission and consent of each of the other Defendants.

44.     More specifically, each of Defendant Production Capital, Defendants Production House, Defendants Fake Base Entities, Defendant Knightsbridge, and

-13-

Defendant Chasing Air, were the alter egos of Defendant Chase and Defendant Robl, and participating in the scheme described herein by and through Defendant Chase's and Defendant Robl's actions and direction as the owners and/or operators of the remaining Defendants. There exists, and at all times herein mentioned has existed, a unity of interest and ownership between Defendants such that any separateness between them has ceased to exist in that Defendant Chase and Defendant Robl completely controlled, dominated, managed, and operated the other Defendants to suit their convenience.

45.   At all times relevant hereto, Defendant Chase and Defendant Robl controlled the business and affairs of the remaining Defendants, including their business transactions, bank accounts, and fund receipts and payouts; commingled the funds and assets of the corporate entities, and diverted corporate funds and assets for their own personal use; disregarded legal formalities and failed to maintain arm's length relationships among the entities; used overlapping offices or business locations for the companies, including Defendant Chase's own home; held themselves out as personally liable for the debts of the entities; and used the entities as a mere shells, instrumentalities, or conduits for themselves.

46.   At all times relevant thereto, Defendant Chase and Defendant Robl not only influenced and governed the remaining Defendants, but there was such a unity of interest and ownership that the individuality, or separateness, of Defendant Chase and Defendant Robl and the remaining Defendants ceased, and the facts are such that an adherence to the fiction of the separate existence of these entities would, under the particular circumstances, sanction a fraud or promote injustice.

## FACTUAL ALLEGATIONS

## I.   THE FRAUDULENT SCHEME

47.   Base was founded in 2008 in Beijing, China, with a small group of special effects artists, and an early investment from ILM/Lucasfilm, Ltd., a large and very well-known Hollywood visual effects studio. As a capital-intensive business, with special effects studios costing millions of dollars, Base had to raise capital to expand its existing

-14-

business and to fund new original content creation. Base sought both investments and loans to accomplish its business goals.

48.    Base's expansion efforts were eventually successful. Prior to COVID reductions, it grew to over six hundred employees and is currently one of the leading visual effects studios in Asia. Base has provided services on popular movies and television shows including *The Mandalorian*, *Transformers*, *Captain America*, *Iron Man*, and *The Avengers*, and won Emmys for its work on HBO's *The Pacific*, HBO's *Boardwalk Empire*, and Starz's *Black Sails*. In 2021, Base achieved its biggest success to date with the release of the animated hit Netflix film, *Wish Dragon*.

**A.    Defendant Chase Was Introduced as an "Elite" Hollywood Financier**

49.    In 2013, UTA vouched for Defendant Chase, a former child actor and well-known "bridge financier," *i.e.*, someone who provided, at high interest rates, missing or "gap" funding that traditional lenders did not provide. Then, Defendant Chase introduced the Base CEO to the FFI CEO, who similarly vouched for Defendant Chase as one of the best in the business.

50.    Defendant Chase moved in circles that further added to his prestige and prominence. He lived a lifestyle that seemed to validate his larger-than-life persona. And he used those means to further convince the Base CEO that Defendant Chase was a VIP with large financial access, extensive business resources, and valuable personal connections. As discussed above, he introduced the Base CEO to billionaire Elon Musk and flew the Base CEO to have lunch with actor Kevin Costner. He once flew Base's CEO in his private jet to meet a business contact in Utah for financing. Defendant Chase continually gave the impression that he knew everyone in the industry and could arrange anything.

**B.    Defendant Chase Earned Base's Trust with Dependable Financing**

51.    For approximately four years, Defendant Chase professionally courted Base's CEO. Base's CEO finally decided to begin a business relationship in 2017. At that time, Defendant Chase provided funding via loans for a co-production with Sony

Animation Studios ("Sony") and Jackie Chan's production company, Sparkle Roll ("Sparkle Roll"), entitled *Wish Dragon*. *See Revolving Loan Agreement dated July 4, 2017 by and between Base Media Technology Group, Ltd., and Bill Chase,* attached hereto as Exhibit C. As the trust grew, so did the depth of the business relationship.

52.     After witnessing Defendant Chase's connections, the success of his other businesses, and his ease in initiating financing for *Wish Dragon*, the Base CEO decided to partner with Defendant Chase in building the Malaysian Studio. To Base, a partnership with Defendant Chase was the best of both worlds—Defendant Chase represented that he had his own capital to invest, and what he did not have, he was able to raise via Defendant Production Capital, as he had done for others so many times in the past. The Malaysian Studio would provide both Defendants and Base access to valuable government tax rebates as well as expansion into another market. Thus, Base entered into a joint venture with Defendant Chase. Through his company, Defendant Production Capital, Defendant Chase committed to fully funding construction and operational costs, in exchange for half ownership of the Malaysian Studio. It was through Defendant Production Capital that Base's CEO would later be introduced to Defendant Robl.

**C.     Malaysian Studio Partnership Generated Greater Financing Needs**

53.     As Defendants were aware, visual effects studios are expensive, high-risk investments requiring pricey equipment, software, and foreign talent. This was especially true of opening a visual effects studio in another country—Malaysia—which had a less developed relationship with the entertainment industry. Defendants, including Production Capital, soon began falling behind the financing schedule. Further exacerbating the financial position, demand for visual effects work in China was decreasing.

54.     In 2018, to address these financial needs, Defendant Chase told Base that Defendant Production Capital would ramp up their fundraising efforts. Defendant Production Capital began to borrow funds from outside lenders in an effort to meet their

funding obligations to Base. At the same time, Defendant Robl's name began to appear on Defendant Production Capital's documents. Defendant Chase told the Base CEO that Defendant Production Capital was Defendant Chase's company, but that Defendant Robl ran it.

55.     Defendant Chase and Defendant Robl told the Base CEO that funds were borrowed from lenders contracting directly with Defendant Production Capital, and that Defendant Production Capital in turn provided the funds to Base under separate arrangements. Unbeknownst to Base, Defendant Chase and Defendant Robl were in fact entering into agreements purportedly on Base's behalf and promising that Base, not Defendant Production Capital, would pay back high interest loans. Indeed, the Base CEO never imagined that Defendants were borrowing in Base's name far in excess of what Base was receiving, while pocketing the difference for themselves.

**D.     Defendants Deepened Their Relationship with Base**

56.     In or around June 2018, Defendant Chase agreed to provide funding for *Skyfire*—a motion picture which began as a Base and Meridian production, for which Base was also providing visual effects. Defendant Chase helped secure the bond for *Skyfire* with FFI, since he had such a good relationship with the FFI CEO. In fact, Defendant Chase's relationship with FFI was so good that he held meetings and gave the appearance of having a permanent office at FFI. As part of his fundraising efforts, including obligations for the Malaysian Studio, Defendant Chase brought potential investors and equity fund managers to the *Skyfire* film set, the Beijing office, and the Malaysian Studio, where he would screen Base reels to encourage investment.

57.     In or around July 2018, Base's production partner in *Skyfire*, Meridian, asked Base to provide proof of funds from Defendant Production Capital as assurance toward Defendants' $5 million commitment. Defendant Chase, Defendant Robl, and Defendant Production Capital provided records of its escrow account with treasury notes valued at more than $37 million. That additional financial information demonstrated to Base that Defendant Production Capital had more than adequate funds

to meet Defendants' financial commitments. *See* Holdings by Fixed Income for Production Capital, July 19, 2018 (captured in relevant part below, and attached hereto as Exhibit D).

**Holdings by Fixed Income - Detailed**

GROUPING: Account #                                                                        Run Date: 20-Jul-2018 | Data as of: 19-Jul-2018

| Maturity Date | Cost Basis Amount | Adjusted Cost Basis Amnt | Cost | $ Gain/Loss | % Gain/Loss | Accrued Interest | Agency | MMKT Fund Designation | MMKT Acct Designation |
|---|---|---|---|---|---|---|---|---|---|
| 30-Jun-2019 | -- | 1,483,242.19 | 1,483,242.19 | 767.81 | .05 | 1019.020500000 | -- | Security is Not a Money Market | Institutional |
| | – | 37,836,622.47 | | 107,995.53 | | | | | |
| Total: | | | | | | | | | |
| | – | 37,836,622.47 | | 107,995.53 | | | | | |

58.   As Defendant Chase's relationship with Base grew, he asked the Base CEO to take steps to assist with clarifying Defendants, including Defendant Production Capital's, funding relationship with Base. For example, in January 2019, Defendant Chase requested that Base add Defendant Robl to its website, referencing Defendant Robl's affiliation with Defendant Production Capital.

59.   Throughout Defendants' relationship with Base, however, Defendant Chase continually assured the Base CEO that any funds Defendants raised would be through agreements between an investor and Defendant Production Capital (not Base), and that Defendant Production Capital would be the entity to provide such funding to Base. Defendant Chase never told Base that he was telling investors they were investing directly in Base or its film projects.

**E.   Defendants Began Initiating Wires from Various Parties**

60.   In or around January 2019, Base began receiving wire transfers from entities other than Defendant Production Capital, including Gosdom, Inc. ("Gosdom"), Silver Screen Finance, Inc. ("Silver Screen"), and other names unrecognizable to Base. In or around March 2019, some of the wires included entities with a version of Base's name, including Base FXD ART Production, LLC.

61.   When questioned, Defendant Chase and Defendant Robl told the Base CEO that these were funds meant to cover Defendants' obligations to Base. Defendant Chase reassured the Base CEO that although new names were appearing, all the funds came from loans by parties to Defendant Production Capital, with certain funds sent

directly to Base for expediency. Similarly, Defendant Chase explained the use of Base's name on wire receipts was merely for tracking purposes, since Defendants were raising money for multiple investments. Plaintiff later discovered that this was not true. Defendants actually were purporting to transfer equity and security interests in Base's own projects, by entering fraudulent loan and investment agreements, and creating unauthorized entities with Base's name to disguise their ruse.

62.     Throughout, Defendant Chase emphasized that Defendant Production Capital was the borrower and that Defendant Production Capital was covering any underlying short-term, high-interest rate loans. Several of Defendant Chase's investors and lenders confirmed this to the Base CEO, along with sharing that Defendant Production Capital had a record of repayment on prior loans. Despite Base's CEO's requests, Defendant Chase never provided copies of the underlying loan agreements.

## F.     Defendants Committed to Further Financing While Obscuring Their Fraudulent Fundraising

63.     By May 2019, Base needed funds for its next feature film, *Lord of the West,* to which Defendants committed a $6 million investment. Then, in July 2019, the Base CEO received an unexpected inquiry from one of Defendants' investors seeking repayment of funds purportedly loaned to Base. Base was not aware of the purported loan agreement or any others. When the Base CEO inquired, Defendant Chase assured him that it was a miscommunication and would be immediately addressed. Because the Base CEO did not hear anything more about it, Base's CEO believed the inquiry was misdirected and the misunderstanding resolved.

## G.     Alternative Funding Pursued

64.     To avoid reliance on Defendants' short-term loans, in or about October 2019, Defendant Robl introduced the Base CEO to a licensed fund manager who would form a Singapore-based film fund (the "Singapore Fund"). The Singapore Fund would fundraise for future film projects, and manage the investors' money. Base agreed to

partner in the Singapore Fund on the condition that Base would approve all fundraising activities and all incoming and outgoing wire transactions.

65.   Shortly thereafter, in or around December 2019, Base was able to finalize a deal with a new investment partner, which limited Defendants' prior financing role and made participation in the Singapore Fund unnecessary.[25] The new partner, Ease Fortune (HK) Investment Limited (Sunac Culture HK) ("Sunac"), an investor unrelated to Defendants, purchased a majority ownership. Sunac performed significant diligence on Base, including support from an outside financial consultant. During that diligence process, Sunac did not discover any evidence of the fraud.

66.   In anticipation of the Sunac investment, Base created a schedule of Defendants' funding, which was in the 2019 Loan Agreement. *See* Exhibit A, 2019 Loan Agreement. Indeed, the 2019 Loan Agreement includes an Appendix showing all amounts provided by Defendant Chase along with Base's dates of repayment: Base repaid Defendants' loans promptly and as agreed with some portion being converted to equity. *Id.* § 2.

67.   In the 2019 Loan Agreement, Defendant Chase further represented that he had not "signed any agreements with any third-party, other than those entities set forth" in the agreement, "representing any relationship or transaction with [Base]." *See* Exhibit A, 2019 Loan Agreement, § 6. Additionally, in response to the unauthorized Base entities in the wire receipts, Defendants covenanted that it would never again use, "for any purpose, including without limitation fundraising or business development" the "name, brand, or trademarks" of Base or any of its affiliated entities, once more allaying Base's concerns. *Id.* at §4. Defendant Chase signed on behalf of himself and purportedly on behalf of other parties who had sent money directly to Base.

---

[25] In January 2020, Base explicitly informed Defendants that Base "does not approve any transaction or activity with the Singapore company that has [Base] as a shareholder." Email dated January 17, 2020, 9:57 a.m. from a Base Board Member to Po Li Liang, attached hereto as Exhibit E.

68.     At the same time as the 2019 Loan Agreement, Defendant Chase, Base's CEO, and another Base investor entered into an accompanying Side Letter Agreement on November 26, 2019 ("Side Letter Agreement") which granted Defendant Chase a 5% equity interest in Base. *See Side Letter Agreement dated November 26, 2019*, attached hereto as Exhibit F. As part of the Side Letter Agreement, Defendant Chase and the Base CEO entered into the January 29, 2020 Nominee Deed agreement between Defendant Chase and the Base CEO ("Nominee Deed"), whereby the Base CEO would hold Defendant Chase's interests in trust and exercise all voting rights. *See Nominee Deed dated January 19, 2020*, attached hereto as Exhibit G. Lastly, Defendant Chase and Base, among others, entered into an agreement clarifying Defendant Chase's ownership in Base and/or its affiliated companies and any funds owed between the parties, on December 30, 2019 (the "December 2019 Agreement," and together with the 2019 Loan Agreement, the Side Letter Agreement, and the Nominee Deed, collectively the "2019 Agreements"). *See December 2019 Agreement dated December 30, 2019*, attached hereto as Exhibit H. That agreement clarifies that Defendant Chase surrendered his interest in the Malaysian Studio—an interest that was at risk of becoming worthless,[26] but maintained his 5% equity interest in Base.

69.     As Base would later find out when many of Defendants' investors and lenders made demands on Base for repayment, Defendant Chase did not have the legal authority to sign for them, and he had swindled Base out of the consideration it provided in the 2019 Agreements—the 5% equity interest in Base, 15% of the Base CEO's and another founder's breakeven corridor (*i.e.,* the profits made after a film recovers costs expenses) in *Wish Dragon*, and $500,000. Base assessed the value of what it was purportedly receiving based on Defendant Chase's representations, *i.e.*, the freedom

---

[26] This transaction turned out to be a favorable one for Defendant Chase—losses for the Malaysian Studio after January 2020 ran over seven figures and it was on the verge of bankruptcy. The Malaysian Studio was a failed investment that did not produce returns for its investors.

1  from any financial obligation to any other party with respect to the funding that

2  Defendants had provided to Base.

3       70.    Later, Base further found out that Defendant Chase had omitted the

4  material information that he had entered into agreements with numerous third parties

5  not listed in the 2019 Loan Agreement, in contravention of his representations therein,

6  and forged many of those agreements in Base's name.

7       71.    Entering 2020, after finalizing the Sunac transaction, Defendants had yet

8  to complete their $6 million commitment to *Lord of the West* and Base was still unaware

9  of Defendants' fraud. Thus, Defendants continued their financing for the *Lord of the*

10  *West* film and even paid Base for visual effects work for another small live action film.

11       72.    In fall 2020, in furtherance of the fraud, Defendant Robl negotiated an

12  agreement to buy an ownership interest in *Wish Dragon* from Sparkle Roll. Ultimately,

13  Defendant Robl refused to complete the transaction, and instead walked away after

14  acquiring confidential data about the film project, its financing structure, and status.

15  Upon information and belief, Defendant Robl used this inside information he gained

16  from negotiations to mislead investors and raise additional funds.

17  **II.**     **DISCOVERY OF THE FRAUD**

18       73.    Defendants' tangled web of lies began to slowly unravel in late 2020.

19  Beginning in November 2020 and continuing through 2021, multiple putative investors

20  and lenders contacted the Base CEO about possible fraud. Calls and emails began to

21  stream in from people who had been duped by Defendant Chase, Defendant Robl, and

22  Defendant Production Capital, demanding payment on loans they thought had been

23  made to Base. Those individuals presented documents Defendant Chase and Defendant

24  Robl had given them, which purported to have been signed by someone at Base, but

25  which in every case, bore a forged signature. *See supra*, Introduction, ¶ 17 (providing

26  comparison of forged signatures). The forgeries included millions of dollars of loans

27  taken out purportedly in Base's name, and backed by purported security interests in

28  Base's assets. Other agreements purported to grant percentages of revenue streams and

equity interests in Base's film projects to Defendants' investors and lenders. Upon information and belief, Defendant Chase and Defendant Robl repeatedly and falsely promised these lenders that payments were forthcoming from Base, but then consistently failed to pay back the loans, thus seriously harming Base's reputation in the industry, and forcing Base to defend itself from suits by those investors and lenders, who erroneously thought they had entered into agreements with Base.

### A.  Defendants Formed the Singapore Fund to Funnel Fraudulently Obtained Funds to One of Their Fake Base Entities

74.  The first discovery of Defendants' fraud in November of 2020, was in a call to the Base CEO from the Singapore Fund manager inquiring about a $4 million dollar loan the Singapore Fund made to a putative Base entity in Switzerland in April 2020. Until that call, Base was unaware that the Singapore Fund had raised any money because no such funds had been reported to Base, let alone provided to Base.

75.  In further discussions, the Base CEO discovered that the $4 million dollar loan had been wired to a fake Base entity, created by Defendants and using Base in the name—Base FX Productions Switzerland AG ("Fake Base Switzerland").

REVOLVING CAPITAL ADVANCE AGREEMENT

As of 1st August 2020, This Revolving Capital Advance Agreement (the "AGREEMENT") is entered into by and between:

1. Base FX Productions Switzerland AG, a company incorporated in Zug, Switzerland with registered number CHE-153.424.592 whose registered office is at Aberennain 6340 Baar, (the "COMPANY"); and

2. Base Media Capital Singapore Pte Ltd, a company incorporated in Singapore with registered number 201938519Z whose registered office address is 51 Changi Business Park Central 2 #04-05 The Signature Singapore 486066 (the "CAPITAL PROVIDER");

WHEREAS, the Company seeks to allocate capital in connection with provid bridge loan and like financing for pre-production related expenses, post-production visual (or otherwise in connection with the funding of certain off budget obligations), and/or othe related and/or ancillary expenses associated with motion pictures;

WHEREAS, the Company wishes to raise monies from individuals and enti for the purpose of making capital available in connection therewith; and

WHEREAS, the Capital Provider wishes to advance capital to the Company the purpose of making capital available, in exchange for financial consideration on such ca advance;

NOW, THEREFORE, in consideration of the mutual benefits inuring to the Company and the Capital Provider, and other good for and for valuable consideration, the receipt, adequacy and legal sufficiency of which both the Company and the Capital Provider hereby acknowledge, IT IS HEREBY AGREED AS FOLLOWS:

KEY TERMS:

| | |
|---|---|
| Denomination: | Singapore Dollars (SGD) |
| Upper Limit of Advance: | SGD 5,000,000.00 |
| Maturity Date following Tranche Allocation: | 3 Years |
| Annual Premium Rate: | 30.5% |
| Quarterly Payments: | Every 92 Days |
| Notice Period prior to Allocation of Tranche: | 3-7 Days |
| Early Redemption Notice: | 120 Days |

WIRE TRANSFER INFORMATION

40.  Any wire transfer made to the Company in connection with, or otherwise under, this Agreement, shall be made by wire transfer.

41.  This Agreement may be executed and delivered in counterparts, including by PDF e-mail, each of which shall be deemed to be an enforceable original and all of which together shall constitute one enforceable instrument.

IN WITNESS WHEREOF, the Company and the Capital Provider have duly executed and delivered this Agreement as of the date first above written.

As for the Company:
Base FX Productions Switzerland AG

Name: Kevin Robl
Title:  CEO

As for the Capital Provider:
Base Media Capital Singapore Pte Ltd

Name: Stephen Ho
Title: Managing Director

-23-

1    [Source: *Revolving Capital Advance Agreement dated August 1, 2020 between Base FX*
2    *Productions Switzerland AG and Base Media Capital Singapore, PTE Ltd.* (the "Base
3    Switzerland Loan Agreement"), attached hereto as Exhibit I].

4        76.    The Base Switzerland Loan Agreement was (i) signed by Defendant Robl
5    without Base's knowledge, (ii) funded without Base's involvement, and (iii) the
6    proceeds of which were never received by Base.[27] Ahead of funding this loan, upon
7    information and belief, Defendant Robl, potentially in concert with others, also
8    fraudulently altered and forged the corporate documents to amend the shareholder
9    structure of the Singapore Fund, reducing Base from the majority shareholder to a
10   minority shareholder without Base's knowledge or consent.



SHARE TRANSFER FORM

We, BASE MEDIA TECHNOLOGY GROUP LIMITED (Reg NO. 1200114)
of Level 12, 28 Hennessy Road, Wanchai, Hong Kong

(hereinafter called the "Transferor")

IN CONSIDERATION of the sum of Singapore Dollar One only (S$1/-)

Paid by        Ho Yuen Sin (NRIC NO. S1789008E)
               of 41A Bedok Ria Crescent, #01-45 Stratford Court, Singapore 489929

(hereinafter called the "Transferee")

DO HEREBY TRANSFER to the Transferee Fifty-Two Thousand (52,000) ordinary shares fully paid-up
and in the undertaking called

BASE MEDIA CAPITAL SINGAPORE PTE. LTD.

To hold unto the said Transferee, Executors, Administrators, and Assigns, subject to the several conditions
on which I held the same immediately before the execution hereof, and the said Transferee, do hereby
agree to accept the said shares subject to the conditions aforesaid.

Dated:         0 9 APR 2020

IN WITNESS: -

Signed, sealed, and delivered by the Transferor    )       Signed on behalf of
in the presence of:                                )       BASE MEDIA TECHNOLOGY GROUP
                                                   )       LIMITED

Name of Witness: *Aue Soiran*                              Director:
NRIC No.:                                                  *Chris Bramble*
Date:

Signed, sealed, and delivered by the Transferee    )
in the presence of:                                )

Name of Witness: *Augus Ho*                               Transferor: Ho Yuen Sin
NRIC No.: *S9279(/88*
Date: *080420*

---

27 When confronted with this issue, Defendants immediately assured Base's CEO that
they would repay their investors, and shut down the Fake Base Switzerland entity.
Upon information and belief, however, Defendants have not repaid the $4 million
purportedly outstanding.

-24-

[Source: *Director's Resolution in Writing Pursuant to the Company's Constitution, Share Transfer Form*, April 9, 2020, attached as Exhibit J (bearing the forged signature of the Base CEO)].

### B.   Defendants' Forged Agreements Emerge

77.   Base has also learned that the Defendants were forging Base CEO's signature on multiple agreements purportedly on Base's behalf. A summary of these known forgeries and other frauds is provided below.

| Exposed Forgeries and Payment Demands | | | | |
|---|---|---|---|---|
| **Investor** | **Dollar Amount** | **Date of First Forgery** [28] | **Date of Repayment Demand** [29] | **Comments** |
| Singapore Fund/ Fake Base Switzerland | $6.767M | N/A | Nov 2020 | Defendant Robl caused the Singapore Fund to lend funds raised for Base to Fake Base Switzerland— without notifying Base. |
| Julius Wang | $2.949M | May 2019 | Feb 2021 | Defendant Chase and Defendant Robl caused Julius Wang to lend funds purportedly to Base using a forged agreement. |
| Singapore Fund Manager/ Kings Offer | $1M | Jan 2019 | Jun 2021 | Defendant Chase and Defendant Robl forged an investment agreement for an equity stake in *Wish Dragon*. |

[28] Upon information and belief, dates are approximations of the relevant time periods.

[29] Upon information and belief, dates are approximations of the relevant time periods.

| Exposed Forgeries and Payment Demands | | | | |
|---|---|---|---|---|
| **Investor** | **Dollar Amount** | **Date of First Forgery** [28] | **Date of Repayment Demand** [29] | **Comments** |
| Joseph Tang | $80M | Feb 2019 | Jul 2021 | Defendant Chase and Defendant Robl worked with Joseph Tang to bundle smaller loans with a series of fake agreements.[30] |
| Cambridge Sarnano | $100M Credit ($75M used) | Aug 2019 | Aug 2021 | Defendant Robl forged a $100M line of credit agreement with Cambridge Sarnano, as further alleged *infra,* ¶¶ 78-83. |
| Vanessa Guo/ Gosdom | $18M | Jan 2019 | Oct 2021 | Defendant Chase and Defendant Robl entered into a series of forged agreements with Vanessa Guo and her bundled investors. |
| Kennedy Lewis | $10M | Unknown | Feb 2021 | Defendant Chase and Defendant Robl entered into forged agreements to create the Kennedy Lewis line of credit to pay off other investors. Kennedy Lewis has since made demands on Base. |

---

[30] One such lender, Richard Chung, has filed suit referencing that his investment alone was $600,000 and premised on a $90,000 premium on return plus 1% of gross receipts in *Wish Dragon. See* Complaint, Case No. 22STCV07742 (Sup. Ct. Cal. March 3, 2022).

| Exposed Forgeries and Payment Demands | | | | |
|---|---|---|---|---|
| **Investor** | **Dollar Amount** | **Date of First Forgery**[28] | **Date of Repayment Demand**[29] | **Comments** |
| Paul Liang/ The Princeton Project and Fang Fang Ho/ Real Winners, Inc. | $40.737M[31] | Jul 2018 | Mar 2022 | Defendants fraudulently entered into multiple investment agreements with Liang and Ho/ The Princeton Project and Real Winners, who have since initiated a lawsuit naming Base, among others. |
| Film Producer SG[32] | Unknown | Unknown | Unknown | Unknown |
| **Total** | **$234.453M** | | | |

### C.    Extreme Example of Defendants' Fraudulent Dealings

78.    As noted in the above chart, Base is facing multiple multi-million dollar demands for repayment with some reaching as much as $75 million, well in excess of Base's enterprise value at the time the transactions were entered.[33] Specifically, in August 2021 the owner and manager of the Cambridge Sarnano fund (the "CS Fund") first contacted Base's CEO with a demand for repayment on an overdue $100 million line of credit, of which $75 million had been drawn. Until that point, no one at Base had

[31] As some of these funds were allegedly sent to Base FX International, a fake Base entity opened and operated by Defendants and Julius Wang, those funds may also be included in the value of the fraud attributed to the Julius Wang row above.

[32] Film Producer SG has recently informed Base that he was also defrauded by Defendants. He did not disclose the loss amount.

[33] While Base strongly contests any liability under the Defendants' multiple fraudulent agreements, the demands made on Base, and litigation filed against Base, subject Base both to potential liability as well as significant out of pocket expense in defending and protecting itself. Further, the continued reputational damage is grave.

ever heard of the CS Fund, nor had they spoken to, let alone transacted with, anyone from the CS Fund. Notably, Base had not received any money from the CS Fund.

79. When Base's CEO requested more information including the alleged agreements and the wire transaction information, the fund owner remitted two forged agreements (the "Forged CS Fund Agreements")[34]—one that was purportedly signed by an acquaintance of Base's CEO (the acquaintance is not a director, officer, or employee of Base), and the other which had a clearly forged signature purporting to be that of Base's CEO. *See supra,* Introduction, ¶ 17 (comparing Base's CEO's authentic signature to the forgeries). Further, the notices of default sent by the CS Fund contained a list of numerous film projects that never involved Base as a production company. Upon review of the Second Amended Revolving Credit Facility Agreement, dated April 10, 2020, provided by the CS Fund, its forged status is readily apparent. The agreement purports to bind the CS Fund and Base, but also includes multiple fake Base entities, which upon information and belief were opened and operated by Defendant Chase and Defendant Robl. The Second Amended Revolving Credit Facility Agreement further lists various entities including Defendant Base FXD ART Production LLC, Defendant Base Productions Trinidad, and Fake Base Switzerland (*i.e.,* the same fake entity that received a loan from the Singapore Fund)—none of which are authentic Base-related entities. Together, the CS Fund agreements extend a $100 million line of credit[35] for dozens of productions that had no relation to Base.

80. According to the owner and manager of the CS Fund, Defendant Robl acted as the primary contact for Base with respect to this credit facility. Defendant Robl provided the CS Fund with forged memos signed in Base's CEO's name and provided

---

[34] *See First Amended Revolving Credit Facility Agreement* between Base and Cambridge Sarnano, August 1, 2019, attached as Exhibit K (bearing a forged signature on behalf of Base); *Second Amended Revolving Credit Facility Agreement* between Base and Cambridge Sarnano, April 10, 2020, attached as Exhibit L (same).

[35] Since Base was only valued at $50M, had the CS Fund done any diligence, they would have been easily able to discern that this loan agreement was fraudulent.

fake updates that he purported were from Base's CEO when they were not. Upon information and belief, Defendant Chase and Defendant Robl forged these documents in order to obtain funds to pay off other investors and lenders and for personal gain.

81.     The Base CEO immediately confronted Defendant Robl about the matter when it was discovered. Defendant Robl apologized, and pled with the Base CEO not to contact the authorities, promising to pay back all the funds. The Base CEO demanded that Defendant Robl remediate his fraudulent actions and practices in order to correct any negative repercussions for Base that Defendants caused. Defendant Robl agreed to draft an agreement that would migrate any fraudulent Base agreements to Defendant Robl and his companies, leaving "nothing on Base."[36]



11/1/21, 7:51 AM

Kevin Robl (13107708722)

U have a minute?

Just emailed a doc to ur chris@me.com address that conveyed
Control of CS to me on 10/26

If u can pls get the release we have been talking about I will
Sign on behalf of CS meaning all claims
By the people who are
Calling and emailing u fall on CS and PC nothing on Base.

[Source: November 1, 2021 text message from Defendant Robl to Base's CEO.]

82.     Defendant Robl further represented to the Base CEO that he had purchased the CS Fund,[37] and that any issues would thus be resolved through his acquisition of the debt. Defendant Robl went so far as to provide the Base CEO with another agreement documenting the purported sales transaction between himself and the CS Fund to Base. *See* Company Equity Purchase Sale Agreement and Indemnity dated October 26, 2021 ("Fund Purchase Agreement"), attached hereto as Exhibit M, and referenced below.

---

[36] When Defendant Robl and the CS Fund attempted to have Base become party to that new agreement, Base declined because Base did not want to enter into any agreement that could purportedly legitimize Defendants' fraud.

[37] Defendant Robl's attempts and representations that he purchased (or was in the process of purchasing) various entities appears to be part of his *modus operandi* with respect to his fraudulent schemes.

From:       Kevin Robl
To:         BrembleChristopher
Subject:    Fwd: doc
Date:       Sunday, October 31, 2021 4:46:22 PM
Attachments: Executed Agreement.pdf

Please find doc attached that gives me ownership and control of Cambridge Sarnano.

If I can get the release I can sign it on behalf of CS which covers all of the people who are calling and emailing.

Thanks,
Kevin

[Source: Email dated October 31, 2021 from Kevin Robl to Base's CEO, attaching the Fund Purchase Agreement.]

83.     Base has no knowledge of the veracity of Robl's representation, or whether the purported sale agreement is authentic or merely another forgery. However, upon information and belief, the fund's prior owner continues to own and manage the fund.

## III.   DEFENDANTS CAUSED HARM TO BASE THROUGH THEIR FRAUDULENT SCHEME

84.     As the fraudulent actions of Defendant Chase and Defendant Robl surfaced, Base began to realize that it had fallen victim to career criminals. Base is a victim of corporate identity theft and fraud. Defendants spent years luring Base's CEO into a seemingly beneficial and genuine business relationship, building trust and friendship, so Base could be used as a front to deceive investors, and take the proceeds for their own personal gain.

85.     Defendants accomplished the above-described fraud by forging Base's signatures on investment and loan contracts, impersonating Base's CEO, creating fake Base entities, fake Base bank accounts, and fake Base email accounts while also attempting to sign away Base's property rights and project equity. Defendants even conned Base into giving their ringleader, Defendant Chase, 5% of Base's equity.  As a result, Base has suffered severe reputational harm throughout the entertainment industry and is being forced to defend itself in multiple lawsuits, at significant corporate expense. Additionally, Base was forced to bring the instant action to seek not just monetary relief, but injunctive and declaratory relief, as Defendant Chase and Defendant Robl continue to deepen the harm inflicted upon Base with their continued use of the "Base" name.

86.     Further confirming Defendants' fraudulent intentions, Base became aware that detectives in China have initiated a criminal investigation of this scheme. Specifically in October 2021, Beijing detectives came to Base's offices, investigating reported fraudulent investment agreements that were purportedly associated with Base, and bore the Base CEO's forged signature. Base's CEO voluntarily met with detectives multiple times, and turned over emails, texts, and WeChat messages for the detectives to obtain information about Defendants and their associates in connection with the criminal prosecution in China. Detectives were able to verify that Base's CEO's signature on the fraudulent investment agreements was indeed a forgery. The criminal investigation in China is ongoing, and at least one Chinese national has been detained.

87.     Upon information and belief, Defendant Chase and Defendant Robl siphoned off millions for their personal use through their fraudulent scheme, raising over $234.453 million. It is unclear how much of this is still in Defendants' possession and it is equally unclear whether additional fraudulent contracts exist.

**FIRST CLAIM FOR RELIEF**
**Fraud**
**(As against Defendants Chase, Robl, and Production Capital)**

88.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

89.     Defendant Chase's and Defendant Robl's conduct described herein, was replete with intentional misrepresentations, deceit, and concealment of material facts known to Defendant Chase and Defendant Robl, with the intention of thereby depriving Plaintiff of legal rights, or otherwise causing injury. This despicable conduct subjected Plaintiff to cruel and unjust hardship and displayed conscious disregard of Plaintiff's rights, so as to justify an award of exemplary and punitive damages. Defendant Chase and Defendant Robl, by and through the remaining Defendants—Production Capital, the Fake Base Entities, the Production House, Knightsbridge, and Chasing Air—made a series of lies and misrepresentations to lure Base's CEO into a business relationship,

and then routinely concealed material facts from Base to maintain the business relationship, which was used as a front for Defendants' fraudulent scheme.

90.    Beginning in or around 2013, Defendant Chase and Defendant Robl made several representations, material omissions, and misleading statements, intentionally and/or recklessly, and failed to disclose the true facts about their intentions. Specifically, Defendants informed Plaintiff that funding provided by Defendants was either (i) Defendants' own capital, or (ii) short-term loans that Defendants had taken out in order to meet their funding obligations to Base. *See supra,* ¶¶ 8, 55, 61-62. Defendants falsely represented that Base was not contractually obligated under any of those loans, and that each loan listed Defendant Production Capital as borrower. *Id.*

91.    Indeed, Defendant Chase and Defendant Robl concealed from Base that they were forging fake loan and investment agreements, signing Base's CEO's name, sometimes purportedly obligating Base as the borrower of funds, sometimes providing purported security interests in Base's assets, and sometimes purportedly granting parties equity in Base's projects. *See supra,* ¶¶ 13, 16, 55, 61, 68, 69, 85. Without ever telling the Base CEO, Defendant Chase and Defendant Robl attempted to obligate Base under various agreements—both loans and investment agreements alike—putting Base on the hook for the risky high-interest loans by purporting to sign away equity and security interests in Base's projects. *See supra,* ¶¶ 13, 16, 55, 61, 68, 69, 85. And, by refusing to share copies of the underlying agreements, Defendant Chase and Defendant Robl concealed their scheme from Base while directing the proceeds to fake Base entities. *See supra,* ¶¶ 1, 16, 19, 75, 85.

92.    To date, the most substantial fraud relates to the CS Fund. Defendants—without notifying Base and while still misrepresenting to Base that all agreements were merely between the investors and/or lenders and Defendant Production Capital—entered into an agreement with the CS Fund on August 1, 2019 ("Revolving Credit Agreement"), purportedly on Base's behalf by forging Base's CEO's signature, for a $100 million line of credit with repayments to be made at up to 31% interest. Despite

Defendant Chase and Defendant Robl subsequently drawing down about $75 million of the $100 million credit line, Base never received funds from the CS Fund. *See supra,* ¶ 78.

93.     Yet, as a result of Defendant Robl's and Defendant Chase's concealment of the hundred-million-dollar agreement purportedly on behalf of Base, Base continued its business relationship with Defendant Robl and Defendant Chase accepting funds through 2021. Now, the CS Fund, like other investors, has made demands for repayment from Base as recently as January 27, 2022, forcing Base to defend itself, seek protection from this Court, and try to rehabilitate its shattered public image.

94.     Defendant Robl's and Defendant Chase's material omissions and misrepresentations were knowing. Defendant Robl and Defendant Chase knew that they were then pocketing those funds rather than sending them to Base. *See supra,* ¶¶ 1, 55, 87. Defendants did not reveal the truth about the CS Fund to Base's CEO in an attempt to deceive and defraud Base and induce Base's CEO to continue to act in reliance on these representations. And he did.

95.     As a result of Defendant Chase's and Defendant Robl's misrepresentations and material omissions, Plaintiff believed that Defendants were meeting their funding obligations, albeit not on schedule, through Defendants' agreements with their investors. Based on these representations, and without knowledge of Defendants' fraudulent scheme, Plaintiff entered into a series of agreements in late 2019, which assigned 5% equity in Base to Defendant Chase, gave Defendant Chase a percentage in the *Wish Dragon* breakeven corridor, and obligated Base to a $500,000 payout to Defendant Chase. *See supra* ¶¶ 68-69, 85. These benefits would not have been extended had Plaintiff known of the Defendants' fraud on other parties, and forged agreements, like the Forged CS Fund Agreements. Rather, the benefits were all premised on Defendant Chase's and Defendant Robl's misrepresentations that any loans were only owed to Defendants. Defendant Chase and Defendant Robl omitted the material fact that in reality, much of the funds paid to Base came from investors and lenders based

-33-

on forged agreements that Defendant Chase and/or Defendant Robl entered into purportedly on Base's behalf. *See supra* ¶¶ 4, 12, 16-17, 19, 70, 73, 77, 79.

96.     In reliance on these misrepresentations and material omissions, Plaintiff was induced to continue business with Defendants for years, with their last transaction being entered into in April 2020. Defendant Chase and Defendant Robl, by and through Defendant Production Capital, paid the final funds for that transaction to Base in 2021. Plaintiff's reliance on Defendant Chase's and Defendant Robl's representations was justified in that Defendant Chase and Defendant Robl were highly regarded, had successful businesses, and had conducted seemingly legitimate business with Plaintiff for years. *See supra,* ¶¶ 1, 4, 10. Moreover, Defendant Chase was a 46% partner in Plaintiff's Malaysian Studio; and, he and Defendant Robl were investors in Plaintiff's projects. *See supra,* ¶ 8. Had Plaintiff known the actual facts, it would not have continued to conduct business with Defendants and would not have extended Defendant Chase a 5% equity interest in Base.

97.     As a direct and proximate result of Defendants' actions, Plaintiff has been harmed and suffered damages. First, Plaintiff has signed away equity in its company, and its projects to Defendants based on Defendants' misrepresentations and omissions described herein. The 5% equity in Base, obtained by Defendant Chase through his fraud, is currently valued well in excess of $75,000. Further, Plaintiff signed over a share of profits in one of its projects, *Wish Dragon*, to Defendant Chase based on Defendants' fraudulent representations, while Defendants purportedly signed agreements giving away equity in Base's projects, shares of Base's revenue streams, and security interests in Base's assets. The counter parties to those agreements have begun to make demands on Base for payment. As a result, Base is also obligated to fund expensive litigation costs to both defend and protect itself, *see supra* ¶¶ 20, n. 33, while simultaneously attempting to rectify its now harmed reputation. The amount of these damages continues to accrue. Finally, Plaintiff has incurred reputational damage in excess of $75,000. Plaintiff will seek leave to amend this Complaint when the precise

damage amount can be ascertained, or an actual damages amount will be determined at trial, but Plaintiff has at least been harmed in an amount that meets jurisdictional requirements.

## SECOND CLAIM FOR RELIEF
### Fraudulent Inducement as to the 2019 Loan Agreement, the December 2019 Agreement, the Side Letter Agreement, and the Nominee Deed
### (As against Defendants Chase, Robl, and Production Capital)

98.     Plaintiff repeats, realleges and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

99.     Starting in 2019 and continuing through 2021, Defendant Chase and Defendant Robl made a series of lies and misrepresentations to Base's CEO, while omitting material facts, in order to lure Base into a series of contracts, which would inure to the personal benefit of scheme leader, Defendant Chase.

100.    When Defendant Chase signed each of the 2019 Agreements, he represented and attested to the truth of the statements made therein.

101.    The 2019 Loan Agreement, entered into by Base and Defendant Chase, represented that Defendant Chase had not "signed any agreements with any third-party, other than those entities set forth in section 4(ii) [sic] above, representing any relationship or transaction with [Base]." *See* Exhibit A, 2019 Loan Agreement, § 6(iii), *see also id.* at §6(ii). Further, Defendant Chase warranted that the "entities in Section 4(ii) [sic] above, have not signed any agreements with any third parties representing any relationship or transaction with [Base]." *Id.* at §6(iv). The provision further represents that Defendant Chase and his companies have "no legal right or authority whatsoever in any capacity to make decisions regarding the business of [Base] or to otherwise impact [Base's] business decisions." *Id.* at §6(viii). The December 2019 Agreement contained similar representations. *See* Exhibit H, December 2019 Agreement. It also represents that Defendant Chase "has not executed any agreement with any third-party representing any rights or benefits due from [Base]." *Id.* at §2.3.

102.   Further, in the 2019 Loan Agreement, Defendant Chase represented that he is the "controlling shareholder and has the legal capacity to enter into this Agreement on behalf of" himself, Defendant Production Capital, Defendants Production House, Defendant Base FX, Inc., Defendant Knightsbridge, and Defendant Chasing Air, among others, including Silver Screen, Gosdom, Kings Offer, and Base International. *See* Exhibit A, 2019 Loan Agreement at §6 (ii).

103.   These representations were false. First, Defendant Chase, upon information and belief, was not the controlling shareholder of many of the entities on whose behalf he purported to sign the 2019 Loan Agreement. Indeed, upon information and belief, Defendant Chase is not the controlling shareholder, nor did he have legal capacity to enter the 2019 Loan Agreement on behalf of Silver Screen, Gosdom, Kings Offer, or Base International, among others.

104.   Second, Defendant Chase knowingly omitted the material information that, in fact, he had entered into third-party agreements with numerous third parties not listed in the 2019 Loan Agreement §6(ii), in contravention of the representations and warranties in both the 2019 Loan Agreement, and the December 2019 Agreement—for example, the CS Fund, *see supra* § II.C. And although Defendant Chase agreed that he had no authority to make business decisions on behalf of Base, as he well knew, he and Defendant Robl had signed several loan and equity investment agreements purportedly on Base's behalf. *See supra* ¶¶ 13, 16, 17, 61, 85. Moreover, upon information and belief, Defendant Chase knew that many of the entities listed in §6(ii) had in fact signed third-party agreements with many unlisted individuals. For example, Gosdom, one entity listed in §6(ii), entered into several agreements with third parties, such as an equity investment agreement in *Wish Dragon* on January 30, 2019, with Yao Chang Chen, an individual not listed in §6(ii). The agreement contains the forged signature of the Base CEO, which upon information and belief, was forged by either Defendant Chase or Defendant Robl. *See supra* n. 17; *see also* n. 9, n. 10, n. 12, n. 13, n. 14, n. 24 (additional third-party to third-party agreements involving individuals not listed in

-36-

§6(ii), which bear the Base CEO's forged signature, upon information and belief, forged by Defendant Chase and/ or Defendant Robl). Defendant Chase and Defendant Robl then used much of those funds for their own personal purposes.

105.   Despite knowing that these statements were not true, and while knowingly concealing material facts, Defendant Chase and Defendant Robl intended Base to rely on these misrepresentations and omissions in order to induce Base into signing the 2019 Agreements relinquishing certain equity rights and other payments to Defendant Chase.

106.   Plaintiff reasonably and justifiably relied on the misrepresentations and material omissions of Defendant Chase and Defendant Robl, who were highly regarded film financiers, had successful businesses, and had conducted seemingly legitimate business with Plaintiff for years. *See supra*, ¶¶ 1, 4, 10. Moreover, Defendant Chase was a partner in Plaintiff's Malaysian Studio; and, he and Defendant Robl were investors in Plaintiff's projects. *See supra*, ¶ 8.

107.   Defendant Chase's and Defendant Robl's misrepresentations and omissions were material in that had Plaintiff been aware of Defendants' fraudulent scheme involving misuse of Base's name and multiple forgeries, Plaintiff would not have entered into the 2019 Agreements.

108.   Base's CEO, relying on the material omissions and misrepresentations Defendant Chase explicitly attested to in the contracts, signed the 2019 Agreements, resulting in (i) Base paying Defendant Chase $500,000, (ii) 15% of the Base CEO's and another investor's corridor in *Wish Dragon*, and most valuably (iii) a 5% equity stake in Base, currently valued well in excess of $75,000. In signing away these benefits as consideration for a portion of Defendant Chase's loans, and his renunciation of his 46% interest in the Malaysian Studio, Base assessed the value of what it was purportedly receiving based on Defendant Chase's representations, *i.e.*, finality with respect to repayment of Defendants' funding. Little did Base know that there were numerous forged contracts that Defendants had entered into, purportedly on Base's behalf, that Defendants had not disclosed.

109. As a direct and proximate result of Defendants' actions, and Plaintiff's reasonable reliance thereon, Plaintiff has been harmed and suffered damages, including loss of $500,000 in capital, the loss of 5% equity in Base, and reputational damage in excess of $75,000. Indeed, Plaintiff continues to be forced to defend itself from demands made on it by parties who entered into contracts with Defendants. The amount of these damages continues to accrue. Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained, or an actual damages amount will be determined at trial, but Plaintiff has at least been harmed in an amount that meets jurisdictional requirements.

### THIRD CLAIM FOR RELIEF
### Trade Name Infringement
### (As against Defendants Chase, Robl, and Production Capital)

110. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

111. Plaintiff, having operated Base for over fifteen years, has established Base as a trade name used to identify the Base effects, animation, and production business.

112. Defendant Chase and Defendant Robl, by using the Base name in creating new and unapproved entities that represented to have a relationship with Plaintiff, was likely to, and did in fact, cause confusion in the marketplace.

113. This confusion was made certain when Defendant Chase and Defendant Robl, in connection with such entities, used Base's CEO's name and forged his signature on documents as the Founder and CEO of Base.

114. This confusion is evidenced by investors reaching out to Base's CEO and expressing their belief that either (i) Base owed them money, and/or (ii) the investments or loans were made on behalf of Base.

115. As a direct and proximate result of Defendant Chase and Defendant Robl's actions, Plaintiff has been harmed and suffered damages, including reputational damage in excess of $75,000. The amount of these damages continues to accrue.

Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained.

**FOURTH CLAIM FOR RELIEF**
**Trade Libel**
**(as against Defendants Chase, Robl, and Production Capital)**

116.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

117.   Defendant Chase and Defendant Robl, by and through their actions described *supra*, have necessarily disparaged Plaintiff and the quality of its business and services.

118.   First, by creating entities that bear the same name as Plaintiff's, Defendant Chase and Defendant Robl misled multiple parties to invest and/or provide loan money to those fake entities under the premise such funds were being provided to Plaintiff. Nevertheless, in many instances, such funds were not wholly provided to Plaintiff, if provided at all.

119.   Defendant Chase and Defendant Robl knew in creating such entities and carrying out such misleading business practices, that they were promoting a falsity to those investors and loan entities. And Defendant Chase and Defendant Robl knew that parties relying on such statements would cause Plaintiff financial and reputational harm.

120.   Second, by borrowing funds from parties in Plaintiff's name without notifying Plaintiff, forging Plaintiff's signature, and failing to timely repay such funds, Defendant Chase and Defendant Robl have further disparaged and harmed Plaintiff's business.

121.   Indeed, Defendant Chase and Defendant Robl knew that they were entering into false contracts, forging Base's CEO's name on agreements, and that it would cause Plaintiff harm, including pecuniary loss, when Defendant Chase and Defendant Robl failed to repay the loan amounts that were the premise of those false contracts.

122.   As a direct and proximate result of Defendant Chase's and Defendant Robl's actions, Plaintiff has been harmed and suffered damages, including reputational damage in excess of $75,000. The amount of these damages continues to accrue. Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained.

### FIFTH CLAIM FOR RELIEF
### Breach of the 2019 Loan Agreement
### (as against Defendant Chase)

123.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

124.   The 2019 Loan Agreement contained a covenant clearly restricting Defendant Chase's use, "for any purpose, including without limitation fundraising or business development" the "name, brand, or trademarks" of Base or any of its affiliated entities. *Id*. at §4.

125.   The provision went on to clarify that Defendant Chase and his companies have "no legal right or authority whatsoever in any capacity to make decisions regarding the business of [Base] or to otherwise impact [Base's] business decisions." *Id*. at §6(viii).

126.   Defendant Chase accepted these representations, covenants, and warranties when Defendant Chase signed the 2019 Loan Agreement.

127.   Yet, Defendant Chase and Defendant Robl fraudulently created multiple shell entities and bank accounts for those entities which they used in connection with their fundraising efforts purportedly on behalf of Base, including the Defendant Fake Base Entities, in breach of Section 4 of the 2019 Loan Agreement. Defendant Chase used these companies and bank accounts to retain funds meant for Base and to create a façade of legitimacy to his fraudulent scheme.

128.   As a direct and proximate result of Defendant Chase's actions, Plaintiff has been harmed and suffered damages, including reputational harm and loss of capital

in excess of $75,000. The amount of these damages continues to accrue. Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained.

### SIXTH CLAIM FOR RELIEF
### Breach of the December 2019 Agreement
### (as against Defendant Chase)

129.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

130.   The December 2019 Agreement was entered into by Base and Defendant Chase, among others. It provided that the "parties would like to confirm the status of any and all transactions and associated rights and obligations amongst the parties and any and all rights and obligations between [Defendant] Chase, and [Base] and/or any of its Affiliates…" *See* Exhibit H, December 2019 Agreement, § C. In the agreement, Defendant Chase "confirm[ed] that any entity with [Base] ownership or with the 'Base' logo w[ould] be closed promptly," and that he had "not executed any agreement with any third-party representing any rights or benefits due from [Base]." *Id.* at §§ 2.3-2.4.

131.   Defendant Chase accepted these representations, covenants, and warranties when Defendant Chase signed the December 2019 Agreement. *Id.*

132.   Defendant Chase was immediately in breach of Section 2.3 of the December 2019 Agreement upon signing, as Defendant Chase did not disclose the multiple third-party agreements that Defendant Chase entered into by either purporting to represent Base, or by forging Base's CEO's signature.

133.   After signing, Defendant Chase also breached Section 2.4 of the December 2019 Agreement when he not only failed to promptly close all fake Base entities but continued to use those entities to raise and retain funds meant for Base without Base's authorization.

134.   As a direct and proximate result of Defendant Chase's actions, Plaintiff has been harmed and suffered damages, including loss of capital and reputational

-41-

damage in excess of $75,000. The amount of these damages continues to accrue. Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained.

### SEVENTH CLAIM FOR RELIEF
### Civil Conspiracy
### (as against all Defendants)

135.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

136.   The Defendants' scheme as described herein was created and carried out to defraud individuals, including Plaintiff, by concealing Defendants' various violations of law.

137.   With unity of interest, Defendants collectively, and each one, formed a fraudulent scheme with the intent to wrongfully obtain, divert, retain, and use funds raised in Plaintiff's name. As part of that scheme, Defendants opened illegitimate entities and bank accounts in Plaintiff's name to serve as destinations for funds illegally obtained through Defendants' forgeries of Base's agents' names on agreements with other parties.

138.   With unity of interest and in taking the actions described herein, Defendants collectively, and each of them, acted within the course and scope of their scheme with the knowledge, permission, consent, ratification, and/or adoption of the other Defendants collectively, and each of them. Defendants acted in accord and carried out the scheme jointly.

139.   With unity as alter ego entities, Defendants, acted in accord, have engaged in fraudulent conduct and transactions, using Plaintiff's name and reputation.

140.   Acting within that fraudulent scheme, Defendants obtained hundreds of millions of dollars in Plaintiff's name and used those funds for their own personal gain.

141.   Since at least 2013, Defendants have engaged in a pattern and system of fraudulent activity against Plaintiff. Plaintiff, among others, has been victimized by

Defendants' scheme, which was well orchestrated and calculated to defraud Plaintiff and investors.

142. As a direct and proximate result of Defendants' conspiracy, Plaintiff has been harmed and suffered damages, including loss of capital and reputational damage in excess of $75,000. Plaintiff will seek leave to amend this Complaint when the precise damage amount can be ascertained.

143. Due to Defendants' fraudulent conduct, Defendants are jointly and severally liable to Plaintiff for any damages awarded.

**EIGHTH CLAIM FOR RELIEF**
**Declaratory Judgement**
**(as against all Defendants)**

144. Plaintiff repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as though fully set forth herein.

145. An actual case or controversy exists over Defendants' obligation to indemnify Plaintiff Base for demands, settlements, judgments, or awards made against it, where such demands, settlements, judgments, or awards are based on (i) a document signed or forged by Defendant Chase or Defendant Robl, or (ii) any party listed in the 2019 Agreements on whose behalf Defendant Chase purported to sign, in exchange for value paid by Base, *see supra,* ¶¶ 66-70.

146. The controversy is tied to concrete and justiciable facts involving Defendant Chase's and Defendant Robl's representations in the 2019 Loan Agreement, and their various forgeries, including those pictured, *supra,* ¶ 17.

147. A declaration from this Court would concretely define the parties' positions. Rather than simply serve as merely an advisory opinion, a declaratory judgment would clarify the obligations between the parties based on Defendants' fraudulent conduct. Further, such a declaration would be in the best interests of judicial efficiency rather than causing Base and the Defendants to relitigate whether Defendants are obligated to indemnify under each separate agreement, where the underlying

fraudulent scheme is the same, and is already being litigated before this Court. Having a declaration now, would streamline the ability of various actions to be resolved pre-litigation.

148.   Plaintiff Base seeks a declaratory judgment that where Base pays a demand, settlement, judgment, or award based on a document signed on Base's behalf by Defendant Chase or Defendant Robl, whether signed in Defendants' names, or as a forgery of a Base representative, Defendants, jointly and severally based on their status as co-conspirators and alter egos, must indemnify Base pursuant to the common law and the December 2019 Agreement. *See* Exhibit H, December 2019 Agreement, § 2.9. Similarly, Plaintiff Base seeks a declaratory judgment such that where Base pays a demand, settlement, judgment, or award to any entity listed in the 2019 Loan Agreement who Defendant Chase purportedly signed on behalf of, but for whom Defendant Chase did not have actual authority to sign, Defendants, jointly and severally based on their status as co-conspirators and alter egos, must indemnify Base pursuant to the common law and the parties' agreement. *Id.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in favor as follows:

1)   With respect to all Claims of this Complaint, against Defendants jointly and severally, the amount of money damages sustained by Plaintiff, plus interest in an amount to be determined at trial.

2)   With respect to Claims 1, 2, and 4 of this Complaint, against Defendants jointly and severally, punitive damages in an amount to be determined at trial.

3)   Injunctive relief barring Defendants from any further use of the Base name and/or logo.

4)   Declaratory Judgment.

1      5)    An award against Defendants for the costs and disbursements

2  related to this action.

3      6)    Such other and further relief as this Court deems just and proper.

4

5

6

7  Dated: March 24, 2022              PILLSBURY WINTHROP SHAW
                                    PITTMAN LLP

8

9                             */s/ Aaron S. Dyer*

10          By:    AARON S. DYER
                      KIMBERLY D. JAIMEZ

11                        CASSANDRA N. LOVE

12                        *Attorneys for Plaintiff*

-45-