# EXHIBIT B

# INVESTMENT AGREEMENT

THIS AGREEMENT (this "Agreement") is made and entered into as of January 28, 2019, (the "Effective Date") by and between Kings Offer Pte, Ltd. ("Investor"), and Base Media Technology Group, Ltd. (hereafter, the "Company").

## RECITALS

A.  WHEREAS, the Company is the producer of that certain animated feature length motion picture entitled *Wish Dragon* (the "Picture") which is currently in production;

B.  WHEREAS, Investor has confirmed its willingness to invest an amount of One Million Dollars ($1,000,000.00 US Dollars) as equity investment (the "Equity Investment") in connection with the production budget for the Picture subject to the terms set forth herein, in order to acquire the rights to share in the revenues and equity of the Picture as set forth herein,

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants herein contained, and for good and valuable consideration the sufficiency of which is hereby acknowledged, the parties agree as follows:

## AGREEMENT

1) Incorporation of Recitals.  The Recitals set forth above are herein incorporated into the body of this Agreement by reference.

2) The Picture and Production Arrangements: The Picture is be based on that certain screenplay ("Screenplay") of the same title written by C. Paul.  The Picture is being directed by Chris Appelhans and produced by Aron Warner.  The principal lead voice actor performing the role of "The Dragon" is Jackie Chan.  The current budget of the Picture ("Budget") is equal to US$ 48,000,000.

3) Distribution of the Picture: The Company intends to license the distribution rights to the Picture throughout the world (excluding Mainland China) to Columbia Pictures Film Production Asia Limited ("CPFPA"), a subsidiary of Sony.  Marketing and distribution of the Picture in Mainland China will be conducted by Ten Cent.

4) Financing of the Picture.  The Picture has been financed by Company, Sparkle Roll HK and CPFPA pursuant to that certain agreement dated as of May 28, 2017 (the "CPFPA Agreement").  The Equity Investment shall be used as part of the financing provided by Company pursuant to the CPFPA Agreement.  The term "Other Equity Financiers", as used in this agreement shall mean all other parties that have provided financing for the Picture.

5) Collection of Gross Receipts.  The distribution agreements for the Picture shall require all licensing fees and/or advances and revenues ("Gross Receipts") to be paid to the Collection Account (as defined below).  Company, Investor, and all other persons or entities entitled to a share in the revenues of the Picture shall be beneficiaries under a collection agreement

("Collection Agreement") entered into by Company with a recognized collection agent (either Freeway or Fintage), (hereafter "Collection Agent"), providing for payment of all distribution proceeds into an account designated by the collection agent ("Collection Account"), and incorporating the terms of the Waterfall (as defined below), including the relevant payment priority of Investor as set forth herein. The Collection Agreement will be completed prior to the completion and delivery of the Picture to the Domestic Distributor.

6) Investment: Upon execution hereof, Investor will remit the Investment to Company at the following bank account:

  Account Name: Base Media Technology Group, Ltd.
  Bank:    HSBC
         HSBC Causeway Bay Branch
         1/F, Causeway Bay Plaza II, 463-483 Lockhart Road
         Causeway Bay, Hong Kong
  Account No.  [REDACTED]
  SWIFT code:  [REDACTED]

7) Recoupment of Investment / Profit Participation / Waterfall:

(a) Recoupment. Investor shall be entitled to recoup the Investment plus a flat one time premium of 20% thereon ("Premium"), from Defined Gross Receipts as set forth in the CPFPA Agreement. For clarity, Investor's recoupment shall be equal to a pro rata portion ("Investor's Share of Recoupment") of the recoupment by Company of its share of the Total Production Costs pursuant to the CPFPA Agreement. Company warrants and represents that its share of the Total Production Costs as set forth in the CPFPA Agreement is currently $4,800,000. Company's share of the Total Production Costs may increase in the event the Picture requires additional financing. Investor's Share shall be equal to the fraction equal to the sum of the Investor's Equity Investment divided by the final total of Company's share of Total Production Costs.

(b) Profit Participation. In addition to the recoupment of the Investment and the Premium, Investor shall be entitled to receive 2.1% of 100% ("Investor's Share of Post-Break Gross Receipts") of Company's share of the Post-Break Gross Receipts as defined in the CPFPA. For clarity, Investor's Share of Post-Break Gross Receipts shall be calculated in the same manner as Investor's Share of Recoupment pursuant to 7(a) above.

8) Investor Reports: The Company shall give standard and customary investor reports to Investor concerning the development, pre-production, production, post-production, distribution and other exploitation of the Picture, including without limitation information concerning all negotiations with respect to the final long form distribution agreement of the

Picture for the United States, and the long form talent agreements with the Principal Cast and any other talent, person, or entity entitled to any participation in the Picture's gross revenues.

9) <u>Accounting and Reports by Company</u>:

    (a)   The Company shall provide to Investor a copy of any final cost statement prepared with respect to the Picture upon completion and the written request of Investor.

    (b)   The Company shall cause the Collection Agent to render to Investor, such written statements of the distribution revenues and the monies due Investor hereunder ("<u>Accounting Statements</u>") as required by the Collection Agreement, which Accounting Statements shall be accompanied by remittance of any amount shown to be due to Investor thereon.

    (c)   The Company shall, upon Investor's written request, avail itself of any audit right that the Company might have under any agreement the Company might enter into relating to the production and distribution of the Picture, provided Investor pays for the cost of any such audit.

10) <u>Representations and Warranties</u>. The Company agrees, represents and warrants to the Investor as follows, which agreements, representations and warranties shall survive the execution and delivery of this Agreement:

    (a)   The Company is a corporation duly organized and now existing in good standing formed under the laws of the state or country of its formation and has the power and authority to own its properties and to transact the business in which it is engaged in all places at which it engages in business. All actions heretofore taken and agreements heretofore entered into by the Company in connection with the Picture and this Agreement were duly authorized and constitute valid, binding and enforceable actions and obligations of the Company. The chief office and principal place of business of the Company and place where the Company's books and records are maintained is at the address set forth herein. The Company shall notify the Investor in writing immediately upon any change in its chief office or principal place of business or of the place where its books and records are maintained.

    (b)   The Company has the power and authority to execute, deliver and carry out the terms and provisions of this Agreement and all documents, instruments and agreements to be executed and/or delivered by the Company hereunder, and has taken all necessary corporate or partnership action to authorize the execution, delivery and performance thereof.

    (c)   The execution, delivery and performance of this Agreement and all other documents, instruments and agreements to be executed or delivered pursuant hereto, and the consummation of the transaction herein contemplated, and compliance with the terms

and provisions hereof and thereof will not violate any provision of law or of any applicable regulation, order or decree of any court or governmental instrumentality or administrative body or agency; will not conflict with or be inconsistent with, or result in any breach of, any of the terms, covenants, conditions or provisions of any mortgage, indenture, deed of trust, agreement or other instrument to which the Company is a party or by which it may be bound or to which it may be subject; if the Company is a corporation or partnership, will not violate any provision of the articles of incorporation or partnership agreement pursuant to which the Company was formed; and will constitute legal valid and binding obligations of the Company, enforceable against the Company in accordance with the respective terms hereof and thereof.

(d)     There are no action, suits or proceedings, pending or threatened, against, affecting or relating to the Company or the Picture before any court or governmental or administrative body, or agency which might result in any material adverse change in the business, operations, properties or assets or in the condition financial or otherwise, of the Company or which would otherwise adversely affect the rights granted to Investor hereunder. The Company is not in default under any applicable statute, rule, order or regulation of any governmental authority, bureau or agency having jurisdiction over it.

(e)     In connection with the execution, delivery, performance, validity and enforceability of this Agreement and any other instrument, agreement or document to be executed and delivered hereunder, no consent of any person and no consent, license, approval authorization, registration or declaration with any governmental authority, bureau or agency is required.

(f)     The Company owns all rights, property and interests assigned or granted by it to the Investor hereunder, and such rights, property and interests are unencumbered except as set forth herein.  Neither the Company nor any other person has conveyed to any other person any rights in or to the rights granted to Investor hereunder, or the proceeds thereof, and no person has or will have any rights of any kind in or to such rights, except as expressly acknowledged herein.

(g)     No insolvency proceedings of any nature are now pending or threatened by or against the Company.

(h)     The Company will duly and timely perform all of its obligations and agreements hereunder.

(i)     The Company has the full right, power and authority to enter into the Distribution Agreements, and to perform its obligations thereunder.

11) **Representation and Warranties of Investor – Risk** : **Investor represents and warrants that Investor has the right to enter into this Agreement.  There is no assurance that any revenues will be earned from the Picture and, if not, Investor may lose part or all of its investment in the Picture.  Other than as set forth herein, Investor shall not have a legal right or authority to make decisions or**



**impact the business decisions of Company. Investor is sufficiently knowledgeable and experienced in financial and business matters to be capable of evaluating the merits and risks of making an investment in the Picture, and to make an informed decision relating thereto. Additional risk factors applicable to the Equity Investment are attached hereto as Exhibit A. Investor has read this Agreement and Exhibit A and is knowingly, voluntarily and intelligently agreeing to enter into this Agreement and provide the Equity Investment.**

12)      <u>Affirmative Covenants</u>.  The Company hereby covenants and agrees as follows:

(a)      The Company shall promptly give written notice to Investor of all litigation, proceedings, controversies or claims affecting the Picture or any of the rights of the Company with respect thereto.  The Company shall, at its own expense, appear in and defend any and all such actions and proceedings and shall obtain and furnish to Investor from time to time, upon demand, all information, documents and subordinations of claims or liens as Investor may require, consistent with this Agreement, to maintain Investor's rights under this Agreement.

(b)      The Company shall, at all times hereunder, maintain its existence and shall supply, or cause to be supplied, all services which Investor may reasonably require in connection with the production, sale, distribution, exhibition and/or exploitation of the Picture.

(c)      The Company shall pay all actual out of pocket costs and expenses, including, without limitation attorneys' fees and court costs, incurred by the Investor in connection with the enforcement of the rights of the Investor hereunder.  Such costs and expenses, together with interest thereon, shall be secured and recoupable as provided herein, provided that any such costs and expenses, together with interest thereon, shall be payable by the Company to the Investor immediately upon demand by Investor, as applicable.

(d)      The Company shall diligently and duly perform and observe all the terms, covenants and conditions on its part to be performed and observed under and pursuant to all agreements entered into by it in connection with the Picture, and shall as appropriate, properly care for, house, store and maintain the Picture and any goods represented by it in good condition, free of use, abuse, waste and deterioration.

(e)      The Company shall, at all times, defend and indemnify and hold the Investor (which for the purposes of this paragraph shall include the respective shareholders, officers, directors, employees, and representatives of the Investor) harmless from and against any and all liabilities, claims, demands, causes of action, losses, damages, settlements, judgments or recoveries resulting from any breach of the warranties, agreements or covenants made by the Company herein, and from any suit or proceeding of any kind or nature whatsoever against the Investor arising from or connected with the transactions contemplated by this Agreement or any of the documents, instruments or agreements to be executed pursuant hereto or any of the rights and properties assigned to the Investor



hereunder, and from any suit or proceeding that the Investor may deem necessary or advisable to institute against any other person or company for any reason whatsoever to protect or enforce the rights of the Investor in connection herewith, including attorneys' fees and court costs and all other costs and expenses incurred by the Investor, all of which shall be paid by the Company on demand.

(f)     The Company shall give Investor prompt written notice of all events of default under any of the terms or provisions of this Agreement and of any changes in management, litigation, or of any other matter which has resulted in or may result in a materially adverse change in the financial condition or operation of the Company or the rights of the Investor hereunder.

(g)     The Company will pay all taxes, assessments and other charges of every kind and nature which may be levied or assessed against the Picture and the revenues derived therefrom (except Investor's income taxes), including, without limitation, any fixed and contingent payments, residuals, and royalties.

(h)     If the Company receives funds from a Distributor or the Sales Agent, such funds will be held by the Company in trust for, and will be remitted to the Production Account, or the Collection Account, as set forth herein.

13)     <u>Relationship of Parties/Confidentiality</u>: Investor and the Company each acknowledge that they are independent contractors and that no partnership, joint venture, agency or employment relationship has or will be created by this Agreement. The parties shall keep the terms of this Agreement strictly confidential except: (a) to the extent disclosure is reasonably required to effectuate this Agreement, to satisfy the conditions precedent or to finance or distribute the Picture; (b) to the extent disclosure is required pursuant to court order or applicable laws or regulations; and (c) to the disclosing party's professional representatives.

14)     <u>Business Opportunities</u>: Each of the parties acknowledges that this Agreement relates only to the Picture and than none of the parties will in any way be restricted from any other business activity (including any motion picture activity), whether or not competitive to the Picture, it being agreed that so-called "corporate and/or joint venture opportunities" or fiduciary opportunities in relation to any such other activities are hereby waived by each of the parties.

15)     <u>Additional Documents</u>: Each of the parties agree to execute any additional documents which may be required or be desirable to fully effectuate the purposes and intent of this Agreement or to carry out the obligations of the parties hereunder, provided that they are not inconsistent with the provisions of this Agreement.

16)     <u>Notices</u>: All notices hereunder shall be in writing and shall be served by personal delivery to Investor or the Company, as the case may be, or by registered or certified mail, return receipt requested, or by telegram or FAX, addressed as follows:

To Company:

#6 Workers' Stadium North Road,
Zhongyu Plaza Suite 301
Chaoyang District,
Beijing, China,100027

To Investor:

Kings Offer Pte Ltd
51 Changi Business Park Central 2
#04-05 The Signature
Singapore 486066

Copy to:

Burgee & Abramoff
20501 Ventura Blvd., Suite 262
Woodland Hills, CA 91364

Any party may change its address at any time by written notice to the other parties. Notices shall be deemed to be served upon receipt by the other party.

17) <u>Assignment</u>: The Company shall not have the right to assign all or any part of its right or obligations hereunder without the prior consent of Investor, which Investor is free to withhold in its sole and absolute discretion. Investor shall have the right to assign all or any part of its rights or obligations hereunder without the consent of the Company. The Company shall execute and deliver any documents or instruments reasonably required by Investor in order for Investor to assign its rights pursuant to this Agreement.

18) <u>Miscellaneous</u>:

   (a) Each party acknowledges that no representation or warranty not expressly set forth in this Agreement has been made or relied upon by the other party, it being agreed that this Agreement constitutes the entire Agreement of the parties regarding the subject matter hereto and supersedes all prior Agreements with respect thereto.

   (b) This Agreement may not be modified except by written agreement signed by each of the parties hereto.

   (c) This Agreement shall in no event be construed as a third party beneficiary contract and is not intended for the benefit of any person or company except the parties hereto.

   (d) No waiver by one party of a breach or default by the other party shall be deemed to be a waiver of any preceding, continuing or succeeding breach of the same or any other provision of this Agreement.

   (e) This Agreement has been entered into in the State of California and shall be construed and enforced under and subject to the laws of said state. Any action or proceeding brought to interpret or enforce any of the provisions hereof must be

brought in the County of Los Angeles.

(f) In any action or proceeding between or among the parties hereto to interpret or enforce any of the provisions hereof, the prevailing party shall, in addition to any other award of damages or other remedy, be entitled to reasonable attorneys' fees and costs.

(g) Section headings contained herein are solely for the purpose of aiding in speedy location of subject matter and are not in any sense to be given weight in the construction of this Agreement.

(h) This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute but one and the same agreement.

(i) Invalidity or unenforceability of one or more provisions of this Agreement shall not affect any other provision of this Agreement.

*[Signature page to follow]*

WHEREFORE, the parties have executed this Agreement as of the Effective Date.

**Base Media Technology Group, Ltd**

_____
Signature

_____
Name

_____
Its:

**Kings Offer Pte, Ltd. ("Investor")**

_____
Signature

Stephen Ho
Name

29th Jan 2019
Its:

## Exhibit "A" Risk Factors

The business of Company will be to finance, produce and exploit the Picture and the ancillary rights therein held by Company (i) that in such ventures the risk of loss is high in comparison with the prospects for any profit and that therefore any investment in Company is suitable only for those investors who do not require liquidity in their investment; (ii) the production of the Picture by Company is an entirely new and speculative venture, and it is impossible to project or predict whether the Investment will result in a gain or loss to the investors and therefore **ANY POTENTIAL INVESTOR PARTY TO THE AGREEMENT SHOULD NOT INVEST IN THE PICTURE UNLESS SUCH PARTY IS PREPARED FOR THE POSSIBILITY OF TOTAL LOSS OF THE INVESTMENT**; (iii) the success of a film in theatrical distribution, television, home video and other ancillary markets is dependent upon public taste which is unpredictable and susceptible to change; (iv) the success of a film may also be significantly affected by the number and popularity of other films being distributed, therefore, the success of a motion picture is impossible to predict and absolutely no assumptions should be made respecting the ultimate economic results which may be realized by the Picture; and (v) in addition to the foregoing, the risks of an investment in Company include, without limitation, the following:

(a) <u>Speculative Nature of the Business.</u> The business of the production and exploitation of motion pictures is highly speculative and has historically involved substantial risks. The costs to produce a motion picture are often miscalculated and may be increased by factors beyond the control of its producer, resulting in inability to complete production which would result in abandonment of the project and a total loss of all funds provided therefore. The ultimate profitability of any motion picture depends upon its audience appeal in relation to its cost of production and distribution. Audience appeal, in turn, depends upon unpredictable critical reviews and changeable public taste, among other things, which cannot be readily ascertained in advance. Based upon available information, a majority of completed motion pictures fail to generate sufficient revenues to recover their cost of production and distribution. Accordingly, there can be no assurance that Company will exploit the Picture so as to enable Company to recoup all or any portion of its Investment or to yield a profit on its Investment. Furthermore, until the completion of post-production and the sale of the Picture to a distributor, it is unlikely that Company will derive any revenues from the Picture. In addition, Company cannot predict the timing or amount of revenues, if any, it may derive from the exploitation of the Picture.

(b) <u>Risks of Motion Picture Production.</u> There are significant risks involved in the production of any motion picture, many of which may materially delay completion of the Picture or make completion impossible. If the Picture is not completed, no revenues will be derived from the Picture. Such risks include, but are not limited to, production costs exceeding available funds, labor disputes, death or disability of key talent or other key personnel, equipment difficulties, destruction of completed film negatives or unanticipated adverse weather conditions. The occurrence of any such event may cause delays and increase production costs and may have a material adverse effect upon the Investment. These or similar events are beyond the control of Investor and/or Company. To the extent that contributions to the capital of Company are insufficient to cover all production costs of the Picture, all such contributions may be lost.

(c) <u>Competition.</u> Company intends to engage in a highly competitive business and therefor the Investment contains a high degree of risk. Competition is encountered in different phases of the production and exploitation of a motion picture. In the production phase of the Picture, competition may have a material effect on the employment and cost of personnel. After

the completion of its production, the Picture will, upon its distribution, be competing with other motion pictures and, indirectly, with other forms of public entertainment. Such competition in the phases of the production and exploitation of the Picture may have a material adverse impact on Investor's Investment. Many companies involved in the production and exploitation of motion pictures have, from time to time, encountered financial difficulties, which reflect the highly competitive character of, and adverse development in, the motion picture industry as well as the unpredictability of public reaction to motion pictures.

(d) <u>Lack of Diversification.</u> Company is formed solely for the purpose of developing, producing and exploiting the Picture. Therefore, the financial performance of Company is solely dependent upon the success of its Picture. In addition, the financial performance of the investment in Company is dependent upon the ability of Company to complete the Picture in a timely and cost-effective manner, the ability of Company to obtain successful theatrical distribution of the Picture and the ultimate audience appeal of the Picture if and when completed.

(e) <u>Risk of Motion Picture Distribution.</u> Distribution of films requires specialized marketing expertise and considerable financial resources. Company will be dependent on a distributor for this marketing expertise and for providing funds for prints and advertising. Without the participation of a distributor, there is little likelihood that significant revenues from any source will be realized. The participation of a distributor does not, however, guarantee that the distribution will be successful or that substantial revenues will be realized therefrom.

(f) <u>Changes in the Film Industry.</u> Technological developments have resulted in the availability of alternative distribution mediums for film entertainment, including expanded pay and cable television and videocassettes, DVDs and digital technologies. These alternative distribution mediums typically have different revenue allocation arrangements from one another and such allocation arrangements often vary over time. In recent years, revenues from licensing of films to network television have decreased, revenues from pay television initially increased substantially, then leveled and have recently begun to fall, and revenues from videocassettes and DVDs and digital platforms have increased significantly while being generated by a smaller group of major titles. Generally, however, the level of theatrical success remains a critical factor in generating revenues in these ancillary markets.

(g) <u>Management.</u> Other than as set forth in the Agreement, the investors will not have a right to participate in the management of the business of Company. Accordingly, no prospective investor should invest unless he or she is willing to entrust all aspects of management to Company. Company shall have the right and power to, among other things, abandon the Picture at any time for any reason.

(h) <u>Federal Income Tax Consequences.</u> Company has not been structured to provide tax benefits to investors, and an investment in Company should not be based on the expectation that tax benefits will accrue therefrom.

