# EXHIBIT C

## REVOLVING LOAN AGREEMENT

THIS LOAN AGREEMENT ("Agreement") is entered into as of July 4, 2017, by and between Base Media Technology Group, Ltd., a company organized and existing under the laws of Hong Kong SAR ("Producer"), and Bill Chase, an individual ("Lender"). Mr. Chase has provided the loans using various companies under his control including Production House Ltd, Production House of Cinema, Inc., Film Finances, Inc., Production House International LLC, Pre Production Capital, LLC and Knightsbridge Entertainment Inc.

### RECITALS

A. Producer owns the copyright to the original screenplay entitled "Wish Dragon" (herein referred to as the "Screenplay"). The Producer is converting said Screenplay into feature length motion picture (herein referred to as the "Picture").

B. Producer required loans to provide for the payment of certain expenses of the Picture (the "Production Financing").

C. Lender has agreed to provide, and Producer has agreed to repay, the Loan upon terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and parties agree as follows:

1. **Loan.** Upon full execution of this Agreement, Lender will wire transfer Loans. Such Loans will be summarized in the Appendix, which will be updated from time to time to reflect the amounts borrowed and repaid. The Loan shall be used for production cost related the Picture, and the Loan Amount shall not be used to pay any producer and/or company fees of Producer or any its affiliates.

2. **Repayment.**

    a. Maturity Date. Upon request of Lender, Producer shall repay the Loan to a bank account designated by Lender, in full, with interest ("Interest") equal to flat interest rate as defined in Appendix of the Loan.

    b. The Lender acknowledges that it has received the repayment of Loan from Producer as set forth in Appendix.

    c. Repayment Instructions. Upon the closing of the completion bond for the Picture or receipt of the Production Financing, whichever is first, Lender shall be the first individual, entity, person or group paid to Bank Account described below.

3. **Warranties and Representatives of Producer.** Producer represents and warrants: (a) it has the right, power, authority and capacity to enter into this Agreement, and this Agreement represents and legal, valid, and binding obligation of Producer, enforceable against Producer in accordance with its terms; (b) it will ensure that all amounts owned Lender under this

1

-EXHIBIT C-
Page 76

Agreement shall be repaid when due hereunder; (c) it owns or controls (or will own or control prior to the commencement of principal photography of the Picture) all rights in and to the Picture, and any other material and elements to be included therein, free of any claims or encumbrances of any third party other than secured lenders and priority lien holders; and (e) neither the Picture, nor any part thereof, will to the best of Producer's knowledge violate or infringe the copyright, literary, dramatic, personal, private or civil or property rights or rights of privacy or any other rights of any third party.

4. **Warranties and Representatives of Lender.** Lender represents and warrants that Lender has the right to enter into this Agreement. This is not an investment in a stock corporation or other business entity selling securities or an entity interest in Producer. The Loan is not to be considered a secured transaction, and Lender is not afforded the protections of the rules and regulations of the Securities Act of 1933. Lender shall not have a legal right or authority to make decisions or impact the business decisions of Producer. All creative and business decisions of the Producer shall be final. Lender is sufficiently knowledgeable and experienced in financial and business matters to be capable of evaluating the merits and risks of making the Development Loan, and to make an informed decision relating thereto.

5. **Taxes.** In the event that any intangible tax or documentary stamp tax is due from Lender to any government agency or authority because of the execution and delivery of this Agreement or the lending of the Loan, Producer shall reimburse Lender for any such tax paid.

6. **Events of Default.** The following shall constitute "Events of Default":

    a. Default in the payment of the Note by the Maturity Date;

    b. Default in the due and timely observance or performance of the terms, provisions, covenants, conditions, agreements or obligations of Producer contained in this Agreement, the Note or in any other agreement relating to the Picture which would materially adversely affect the validity, perfection or priority of the Note;

    c. Producer's failure to perform or observe, in a due and timely manner, any of the other material terms, provisions, covenants, conditions, agreements or obligations contained herein or in any other agreement, contract, indenture, document or instrument executed, or to be executed, by Producer in connection with this Agreement or pursuant hereto and which would have a material adverse effect on the ability or obligation of Producer to perform its obligations under this Agreement and under the other documents, agreements and instruments to be executed pursuant hereto;

    d. If there shall exist or occur, and Lender shall notify Producer of, any event or condition which in Lender's good faith business judgment is an Event of Default or which would have a material adverse effect on the ability or obligation of Producer to perform its material obligations under this Agreement and under the other documents, agreements and instruments to be executed pursuant hereto.

7. **Remedies Upon Default.** Upon the occurrence of an Event of Default, following written notice by Lender to Producer of such Event of Default the Lender may, by written notice to the Producer, declare the entire principal amount of the Note, interest accruing thereon, and any other obligations due to Lender in connection with the Loan, to be due and payable without presentment, demand, protest, or notice, all of which are hereby expressly waived. Additionally, Lender may look to utilize any item or portion of any security held by it hereunder until such time as Lender has received the amounts due and payable to it under the terms of this Agreement.

8. **Indemnification and Reimbursement of Lender.** The Producer shall indemnify and hold harmless the Lender and its affiliates and their respective officers, directors, managers, shareholders, members, representations and agents and shall reimburse the Lender for any loss, liability, claim, damage, expense (including costs of investigation and defense and reasonable attorney's fees and expenses), whether or not involving a third-party claim arising, directly or indirectly, from or in connection with: (a) any breach of any representation or warranty made by Producer; (b) any breach of any covenant or obligation of the Producer contained in this Agreement or any other document entered into by the Producer; (c) any taxes of the Producer which are unpaid as of the execution of this document or owed because of production of the Picture; (d) any brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any person or entity with the Producer in connection with this Agreement; (e)any obligation of the Producer to make, and/or any failure to pay, any change of control or similar payments required to be made or payable by the Producer to any person or entity, including without limitation a current or former employee of the Producer or any current or former independent contractor of the Producer that relate to or arise in connection with this Agreement.

9. **Insurance.** Producer shall secure customary E&O and General Liability insurance for the Picture as soon as possible, and upon issuance shall designate Lender as an additional named insured on each such policy. Producer shall provide copies of certificates of all such insurance to Lender.

10. **Applicable Law and Severability.** Nothing contained herein shall be constructed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provision contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail but the provision of this document which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. The parties agree that this Agreement shall be governed by and construed in accordance with the laws of State of California applicable to contracts made and performed within the State of California.

11. **Notice & Cure; No Equitable Relief.** Before Lender can declare a breach or default regarding Producers' failure to comply with any provision hereof or to fulfill any of its obligations hereunder in the manner prescribed (other than the obligation to make timely payments hereunder, with respect to which no notice is required), Lender shall give Producer written notice specifying the nature of the breach, and Producer shall have ten (10) days following receipt of such written notice within which to correct or effect a cure of such alleged breach. For the avoidance of doubt, Lender shall not be required to provide any notice

to Producer prior to declaring a breach or default resulting from Producer's failure to make a payment when due hereunder. In the event of a failure or omission by Producer constituting a breach of its obligations hereunder, the damage, if any, caused Lender by such breach is not irreparable or sufficient to entitle Lender to injunctive or other equitable relief. Consequently, Lender's sole rights and remedies hereunder shall be limited to the right, if any, to obtain damages at law and Lender shall not have the right in such event to enjoin or restrain the development, production, distribution or exhibition of the Picture, nor to rescind this Agreement, in whole or in part.

12. **Confidentiality.** Except as, and to the extent, required by law, Producer and Lender will not disclose or use and will direct their representatives not to disclose or use, any Confidential Information (as defined below) furnished, or to be furnished, by the other, or its representatives to Company or Lender, as applicable, or its respective representative at any time or in any information about the transaction, including the Loan and Loan Fee (if any), unless (i) such information is already known to the other party or its representatives or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of the other party or its representatives, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the transaction, or (c) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings. Upon the written request of Lender or Producer, as applicable, the relevant party will promptly return to the other, or destroy any Confidential Information in its possession and certify in writing to such other party that it has done so.

13. **Resolution of Dispute by Arbitration.** Any controversy or claim arising out of, or relating to, this Agreement, the breach thereof, or the overage of this arbitration provision, shall be settled by arbitration pursuant to the provisions of California Code of Civil Procedure (or such substitute provisions therefor then in force). BY AGREEING TO ARBITRATON ALL PARTIES ARE WAIVING THEIR RIGHT TO A JURY TRIAL. Any such arbitration shall be conducted in Los Angeles, CA. The arbitration of such issues, including the determination of the amount of any damages suffered by any party hereof by reason of the acts or omissions of another, shall be to the exclusion of any resolution of such issues in a court of law. The decision of the arbitration or a majority of them shall be final and binding on all parties and their respective heirs, executors, administrators, successors and assigns. Any action to secure a judicial confirmation of the arbitration award may be brought in any state or federal court of competent jurisdiction. If the parties or the arbitration appointed by them are unable to agree upon the selection of a neutral arbitration then either party may, at its election, require that the arbitration be conducted under the auspices and rules of the American Arbitration Association ("AAA") and that the neutral arbitrator shall be selected by the AAA. Arbitration hereunder shall not, in any event, (i) prevent any party from joining any other party as defendant in any action brought by or against a third party, nor (ii) prevent any party from filing a legal action hereunder to effectuate any attachment, provisional relief, or summary remedies, provided that such party stipulates in such action, at any other party's request, to arbitration on the merits of said case, nor (iii) prevent a party from filing a legal action to compel arbitration under the arbitration provisions hereof.

4

-EXHIBIT C-
Page 79

14. **Successors and Assigns.** All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, executors, administrators, personal representatives, successors and assigns.

15. **Separate Counterparts.** This Agreement and any amendments, waives, consent, or supplements hereto may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument. Delivery of any executed counterparts of this Agreement by facsimile or transmitted electronically in either a Tagged Image Format File ("TIFF"), Portable Document Format ("PDF") or Joint Photographic Experts Group format ("JPEG") shall be equally effective as delivery of a manually executed counterpart of this Agreement. Any party delivering an executed counterparty by facsimile, TIFE, JPEG or PDF shall also deliver a manually executed counterpart of this Agreement, but failure to do so shall not affect the validity, enforceability or binding effect of this Agreement, and the parties hereby waive any right they may have to object to said treatment.

16. **Entire Agreement.** This Agreement constitute the entire understanding and agreement of the parties with respect to the subject matter of this Agreement, and any and all prior agreements, understanding or representations are hereby terminated and canceled in their entirely and are of no further force or effect. No representation, promise, inducement or statement of intention has been made by any of the parties hereto not embodied in this Agreement, and no party shall be bound by or liable for any alleged representations, promise, inducement or statement of intention not set forth herein.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first set forth above.

**Base Media Technology Group, Ltd.**          **Bill Chase**

By: _____

Name: Christopher Bremble

Title:   CEO

Date: July 4, 2017

5

-EXHIBIT C-
Page 80

Appendix: <u>**LOAN AND REPAYMENT TERMS**</u>

**Loans from Lender to Producer as of April 12, 2018:**

The following spreadsheet sets out the Loans from Lender to Producer since July 4, 2017:

| Date | Received Amount |
|---|---|
| 2017/7/4 | US$350,000 |
| 2017/8/5 | US$350,000 |
| 2017/11/1 | US$350,000 |
| 2018/3/1 | US$1,350,000 |
| 2018/2/22 | US$1,000,000 |
| **Total Loans** | **US$3,400,000** |

Flat Interest Amount: US$35,000

Total Repayment is US$3,435,000.

**Repayment from Producer to Lender as of April 12, 2018:**

The following spreadsheet sets out the repayments from Producer to Lender since October 3, 2017:

| Date | Repayment Amount |
|---|---|
| 2017/10/3 | US$350,000 |
| 2017/12/28 | US$735,000 |
| 2017/12/29 | US$265,000 |
| 2018/1/10 | US$350,000 |
| 2018/3/16 | US$350,000 |
| 2018/2/23 | US$400,000 |
| 2018/2/24 | US$600,000 |
| **Total Repayment** | **US$3,050,000** |

In addition, the US$35,000 interest has been repaid and Lender has received VFX services in the amount of US$50,000. Thus, Total Repayment is US$3,135,000 and the amount outstanding owed to Lender as of April 12, 2018 is US$300,000.