# EXHIBIT I

## REVOLVING CAPITAL ADVANCE AGREEMENT

As of 1st August 2020, This Revolving Capital Advance Agreement (the "AGREEMENT") is entered into by and between:

1. **Base FX Productions Switzerland AG**, a company incorporated in Zug, Switzerland with registered number CHE-153.424.592 whose registered office is at Aberenrain 34, 6340 Baar, (the "COMPANY"); and

2. **Base Media Capital Singapore Pte Ltd**, a company incorporated in Singapore with registered number 201938519Z whose registered office address is 51 Changi Business Park Central 2 #04-05 The Signature Singapore 486066 (the "CAPITAL PROVIDER").

WHEREAS, the Company seeks to allocate capital in connection with providing bridge loan and like financing for pre-production related expenses, post-production visual effects (or otherwise in connection with the funding of certain off budget obligations), and/or other related and/or ancillary expenses associated with motion pictures;

WHEREAS, the Company wishes to raise monies from individuals and entities for the purpose of making capital available in connection therewith; and

WHEREAS, the Capital Provider wishes to advance capital to the Company for the purpose of making capital available, in exchange for financial consideration on such capital advance;

NOW, THEREFORE, in consideration of the mutual benefits inuring to the Company and the Capital Provider, and other good for and for valuable consideration, the receipt, adequacy and legal sufficiency of which both the Company and the Capital Provider hereby acknowledge, IT IS HEREBY AGREED AS FOLLOWS:

KEY TERMS:

| | |
|---|---|
| Denomination: | Singapore Dollars (SGD) |
| Upper Limit of Advance: | SGD 5,000,000.00 |
| Maturity Date following Tranche Allocation: | 3 Years |
| Annual Premium Rate: | 30.5% |
| Quarterly Payments: | Every 92 Days |
| Notice Period prior to Allocation of Tranche: | 3-7 Days |
| Early Redemption Notice: | 120 Days |

-EXHIBIT I-
Page 115

Notice in Advance of Auto-Renewal:      60 Days

Definitions:                See Paragraph 39

## THE REVOLVING CAPITAL ADVANCE

1.      Commencing on 1ˢᵗ August 2020, (the "ADVANCE COMMENCEMENT DATE"), the Capital Provider agrees to advance certain capital on a revolving basis to the Company in the sum of up to Five Million Singapore Dollars (SGD 5,000,000.00) (the "REVOLVING ADVANCE"). The Revolving Advance shall be allocated to, and redeemed from, the Company as provided herein below.

## ALLOCATION OF CAPITAL ADVANCE IN TRANCHES

2.      Monies allocated by the Capital Provider to the Company toward the Revolving Advance shall be made in incremental amounts from time to time with each increment amount hereinafter referred to as a "TRANCHE."

3.      Following on the Advance Commitment Date, when and as the Capital Provider is prepared and able to allocate monies toward the Revolving Advance, he/she/it shall notify the Company (in the manner set forth in Paragraph 18 below) (the "NOTICE") of his/her/its intention to allocate a Tranche toward such Revolving Advance.  Thereafter, the Company shall have **three (3) BUSINESS DAYS** (a "Business Day" shall mean any day of the week exclusive of Saturdays, Sundays and U.S. national holidays) to give Notice the Capital Provider (in the manner set forth in Paragraphs 8 and 18 below) of any desire to exercise a veto on such intended Tranche.

4.      Provided the Company does not exercise any such veto (as described in Paragraph 3 below), then, **following such three (3) Business Days, but not longer than seven (7) Business Days after such Notice** described in Paragraph 2 above, the Capital Provider shall transfer the sum of the desired Tranche via wire transfer, as set forth in Paragraph 40 below.

5.      The first Tranche wired to the Company toward the Revolving Advance shall be known as the "FIRST TRANCHE"; the second Tranche wired to the Company toward the Revolving Advance shall be known as the "SECOND TRANCHE"; so on and so forth; the amount of each Tranche wired by the Capital Provider, and received by the Company, in the manner set forth in Paragraph 40 below, shall be known as the "TRANCHE PRINCIPAL AMOUNT"; and the date upon which each Tranche is wired by the Capital Provider, and received by the Company, in the manner set forth in Paragraph 40 below, shall be known as the "TRANCHE INITIATION DATE."

6.      The record of the Tranche Principal Amount and Tranche Initiation Date for each Tranche wired by the Capital Provider, and received by the Company, shall be reflected, and modified as appropriate, on SCHEDULE A to this Agreement, which shall be incorporated into, and made a part of, this Agreement.

-EXHIBIT I-
Page 116

7.      Unless and until the Capital Provider wires the First Tranche, the terms of this Agreement shall be rendered inoperative, and, if the Capital Provider fails to wire the First Tranche within One Hundred (100) Business Days of the of the Advance Commitment Date, then,  the terms of this Agreement shall automatically be deemed null and void, and neither the Company nor the Capital Provider shall have any further rights or obligations hereunder.

## VETO RIGHT OF THE COMPANY

8.      Within three (3) Business Days of any Notice of intention to allocate a Tranche toward the Revolving Advance, as described in Paragraph 3 above and Paragraph 18 below, the Company shall have the right to elect not to receive such Tranche at such time (the "VETO RIGHT"), upon Notice by the Company to the Capital Provider in the manner set forth in Paragraph 18 below of its election to exercise such Veto Right.

## THE PREMIUM

9.      The Capital Provider shall earn an annual interest rate upon the Tranche Principal Amount (or Tranche Revised Principal Amount, defined in Paragraph 13 below, as appropriate) for each and every Tranche in an amount equal to **Thirty and Half Percent (30.5%)** (the "PREMIUM RATE").  The amount earned at the Premium Rate by the Capital Provider on each and every of his/her/its Tranches shall hereinafter be referred to as the "PREMIUM."

## QUARTERLY PAYMENTS AND COMPOUNDING

10.      Following every period of **ninety-two (92) days** after the Tranche Initiation Date, the Premium earned upon the Tranche Principal Amount (or Tranche Revised Principal Amount, defined in Paragraph 13 below, as appropriate) for such Tranche shall be known as the "QUARTERLY TRANCHE PREMIUM," and the date upon which the Quarterly Tranche Premium has been earned (upon any ninety-two (92) day period after the Tranche Initiation Date) shall be known as the "QUARTERLY PREMIUM AVAILABILITY DATE."

11.      Upon the Quarterly Premium Availability Date, the Quarterly Tranche Premium shall become available for immediate payment to the Capital Provider and/or compounding with the Tranche Principal Amount (or Tranche Revised Principal Amount, defined in Paragraph 13 below, as appropriate) for such Tranche.

12.      Should the Capital Provider elect to receive the entirety or any portion of the Quarterly Tranche Premium by prompt wire transfer from the Company (the "QUARTERLY PAYMENT"), the Capital Provider shall give the Company no fewer than **fifteen (15) days' Notice** in the manner set forth in Paragraph 18 below in advance of the Quarterly Premium Availability Date.

-EXHIBIT I-
Page 117

13.     To the extent the Capital Provider declines to give the Company Notice (in the manner set forth in Paragraph 12 above and Paragraph 18 below) of its election to receive the entirety or any portion of the Quarterly Tranche Premium as a Quarterly Payment, then so much of the Quarterly Tranche Premium, which the Capital Provider has not elected to receive as a Quarterly Payment, shall automatically convert into principal of the Tranche, and, together with the original/prior Tranche Principal Amount and any other Quarterly Tranche Premiums not taken as Quarterly Payments, shall be referred to as the "TRANCHE REVISED PRINCIPAL AMOUNT."

## EARLY REDEMPTION BY CAPITAL PROVIDER

14.     Following ninety (90) days after the Tranche Initiation Date for any Tranche, the Capital Provider shall have the right to redeem the Tranche Principal Amount (or Tranche Revised Principal Amount, as appropriate), or any sub-portion thereof, together with the pro-rata amount of any earned, but unpaid, Premium on such Tranche (the "EARLY REDEMPTION BY CAPITAL PROVIDER").

15.     In order trigger the right of Early Redemption by Capital Provider, the Capital Provider, only after 90 days following the Tranche Initiation Date for such Tranche, shall provide **One Hundred Twenty (120) days Notice** in the manner described in Paragraph 18 below of his/her/its desire to receive the Early Redemption by Capital Provider.  Following 120 days after such Notice, the Company shall wire the amount requested by, and duly owed to, the Capital Provider for the Early Redemption by Capital Provider within three (3) Business Days. To the extent such Tranche is not fully liquidated by the Early Redemption by Capital Provider, the amount of the remaining capital shall be governed by the terms of this Agreement.

## EARLY REDEMPTION BY THE COMPANY

16.     Following ninety (90) days after the Tranche Initiation Date for any Tranche, the Company shall have the right to wire the Tranche Principal Amount (or Tranche Revised Principal Amount, as appropriate), or any sub-portion thereof, together with the pro-rata amount of any earned, but unpaid, Premium on such Tranche, to the Capital Provider (the "EARLY REDEMPTION BY THE COMPANY").

17.     In order trigger the right of Early Redemption by the Company, the Company, only after 90 days following the Tranche Initiation Date for such Tranche, shall provide **One Hundred Twenty (120) days Notice** in the manner described in Paragraph 18 below its desire to wire the Early Redemption by the Company.  Following 120 days after such Notice, the Company shall wire the amount indicated by such Notice to the Capital Provider within five (5) Business Days.  To the extent such Tranche is not fully liquidated by the Early Redemption by the Company, the amount of the remaining capital shall be governed by the terms of this Agreement.



-EXHIBIT I-
Page 118

<u>NOTICES</u>

18.     Any Notice to be given under this Agreement shall be made as follows:

If to the Company:

Base FX Productions Switzerland AG

Aberenrain 34, 6340 Baar, Zug Switzerland

If to the Capital Provider:

Base Media Capital Singapore Pte Ltd

51 Changi Business Park Central 2 #04-05 The Signature Singapore 486066

<u>TRANCHE MATURITY AND REPAYMENT DATES</u>

19.     The maturity date for any Tranche shall be the first day following **three (3) years** after the date of receipt of such Tranche by the Company by wire transfer ("TRANCHE MATURITY DATE").  Within five (5) business days following any Tranche Maturity Date, the Company shall return the Tranche Principal Amount (or Tranche Revised Principal Amount, as appropriate) of such Tranche, together with any remaining earned, but unpaid, Premium thereon, to the Capital Provider by wire transfer to an account indicated by the Capital Provider.

20.     The amount to be repaid for the Tranche Principal Amount (or Tranche Revised Principal Amount, as appropriate) of any Tranche, and any earned, but unpaid, Premium thereon, shall be referred to as the "TRANCHE MATURITY REPAYMENT AMOUNT."

21.     The Tranche Maturity Repayment Amount shall be wired to the Capital Provider within five (5) Business Days of the Tranche Maturity Date.

<u>AUTOMATIC RENEWAL OF TERM</u>

22.     The term of this Agreement, the date of the Tranche Maturity Date for any Tranche, and the date upon which the Tranche Maturity Repayment Amount shall be due and owing, shall automatically renew and extend for an additional period of **Three (3) Years** if the Capital Provider or the Company declines to give Notice (in the manner set forth in Paragraph 18 above), more than **Sixty (60) Days** in advance of the Tranche Maturity Date, of his/her/its election not to renew the term of the Agreement and Tranche.

-EXHIBIT I-
Page 119

<u>REPRESENTATIONS AND WARRANTIES OF THE COMPANY</u>

23.     The Company hereby represents and warrants to the Capital Provider as follows: (a) the Company is duly authorized to enter into this Agreement, to grant the rights herein granted and to perform all its obligations hereunder; (b) this Agreement constitutes the legal, valid and binding agreement and obligation of the Company, enforceable against the Company in accordance with its terms; and (c) the execution and performance of this Agreement are not in conflict with any law or any indenture, agreement or undertaking to which the Company is a party or by which the Company is bound or affected.

24.     The Company agrees, until full and final payment of all sums outstanding under this Agreement, the Company will promptly give oral or written notice to the Capital Provider of: (a) all litigation affecting the Company where the amount of damages being sought exceeds Ten Thousand Dollars ($10,000); and (b) any other matter which has resulted or might result in a material adverse change in the Company's financial condition.

<u>SECURITY/COLLATERAL</u>

25.     The Company and/or one of its affiliates, designees or partners, or a separate party, has the right to acquire certain collateral in certain motion pictures toward which the Revolving Advance may be allocated, which may include, by way of example, a security interest in and to the right, title and interest (including copyrights) in and to the story, the screenplay (including drafts, prior versions and variations thereof) and/or other musical, dramatic and/or literary material, upon which, in whole or in part, such motion pictures are or may be based, or from which such motion pictures are or may be adapted or inspired, or which otherwise may be or has been used or included in such motion pictures, including, by way of example, scripts, scenarios, screenplays, bibles, stories, treatments, novels, outlines, books, titles, concepts, manuscripts and/or other like properties or materials (the "COLLATERAL").

26.     To the extent the Company and/or one of its affiliates, designees or partners, or a separate party has acquired Collateral in certain motion pictures toward which the Revolving Advance has been allocated, then the Capital Providers hereunder, shall enjoy the benefit of such Collateral, on a pro-rata basis in connection with the amount of such Revolving Advance so allocated to such motion pictures.

<u>LIMITATIONS ON LIABILITY/RIGHTS</u>

27.     The Capital Provider shall have no rights as against any motion picture or its producers and/or vendor should the Company fail to satisfy any of its obligations under this Agreement.  This provision shall not constitute a waiver of any other rights the Capital Provider may have, if any, in law or in equity, against any party, including any party named in this provision.  In addition, the Company has a fiduciary duty, and shall make its best efforts, to satisfy its obligations under this Agreement, including, without limitation, to seek monies from the producers of any motion picture to satisfy any monies owed under this Agreement.

-EXHIBIT I-
Page 120

<u>FURTHER DISCLOSURES</u>

28.    The Capital Provider hereby acknowledges that the Company may be pooling Revolving Advances from other capital providers in order to fund obligations for motion pictures.

<u>MISCELLANEOUS</u>

29.    This Agreement and the rights and obligations of the Company and the Capital Provider hereunder shall be governed by and construed in accordance with the laws of the State of New York without giving effect to any conflict of law provision.

30.    The Company and the Capital Provider hereby irrevocably submit to the sole and exclusive jurisdiction of the state and local courts located in the Borough of Manhattan, City of New York if any dispute arises under this Agreement.

31.    THE COMPANY AND THE CAPITAL PROVIDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT THEY MAY HAVE OR HEREAFTER HAVE TO A TRIAL BY JURY IN RESPECT OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE UNDERLYING TRANSACTIONS.

32.    If any provision of this Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, such provision shall be enforced to the maximum extent permitted by law and the remaining provisions shall remain in full force and effect.

33.    The terms of this Agreement shall constitute the integrated agreement as between the Company and the Capital Provider as to the subject matter of this Agreement.  This Agreement supersedes all previous negotiations and discussions between the parties with respect to the matters stated herein, and no parol evidence of any prior or other agreement shall be permitted to contradict or vary the terms hereof.

34.    Capital Provider represents and warrants that he/she/it/they has/have had the opportunity to consult with legal counsel of his/her/its/their choice, are fully aware of the terms contained in this Agreement and has/have voluntarily and without coercion or duress of any kind, entered into this Agreement and the documents executed in connection with this Agreement, if applicable, and have not entered into this Agreement in reliance upon any inducement or promise by the Company not contained herein.

35.    No termination, waiver, modification or amendment to this Agreement shall be binding unless in writing and signed by the Company and the Capital Provider.

36.    The failure of either the Company or the Capital Provider to take action as a result of a breach of this Agreement by the other shall constitute neither a waiver of any particular right related to such breach nor a waiver of either's right to enforce any provision of this Agreement through any remedy granted by law or this Agreement.

-EXHIBIT I-
Page 121

37.     No consent or waiver under this Agreement shall be effective unless in writing.  No waiver of any breach or default shall be deemed a waiver of any breach or default thereafter occurring.  No reliance upon or waiver of one or more provisions of this Agreement shall constitute a waiver of any other provisions hereof.

38.     This Agreement shall bind and inure to the benefit of the Company and the Capital Provider and each of its/his/her/their respective heirs, personal representatives, successors and assigns; provided, however, that the Company shall not assign this Agreement or any of the rights, duties or obligations of the Company without the prior written consent of the Capital Provider, such consent not to be unreasonably withheld.

<u>DEFINITIONS</u>

39.     The capitalized terms in this Agreement shall have the definitions and meanings as follows:

(i)     ADVANCE COMMENCEMENT DATE shall have the meaning set forth in Paragraph 1 of the Agreement.

(ii)     AGREEMENT shall have the meaning set forth in the Preamble of the Agreement.

(iii)     BUSINESS DAYS shall have the meaning set forth in Paragraph 3 of the Agreement.

(iv)     CAPITAL PROVIDER shall have the meaning set forth in the Preamble of the Agreement.

(v)     COLLATERAL shall have the meaning set forth in Paragraph 25 of the Agreement.

(vi)     COMPANY shall have the meaning set forth in the Preamble of the Agreement.

(vii)     EARLY REDEMPTION BY CAPITAL PROVIDER shall have the meaning set forth in Paragraph 14 of the Agreement.

(viii)     EARLY REDEMPTION BY THE COMPANY shall have the meaning set forth in Paragraph 16 of the Agreement.

(ix)     FIRST TRANCHE (and/or another other NUMBERED TRANCHE) shall have the meaning set forth in Paragraph 5 of the Agreement.

(x)     NOTICE shall have the meaning set forth in Paragraph 18 of the Agreement.

(xi)     PREMIUM shall have the meaning set forth in Paragraph 9 of the Agreement.

-EXHIBIT I-
Page 122

(xii)    PREMIUM RATE shall have the meaning set forth in Paragraph 9 of the Agreement.

(xiii)    QUARTERLY PAYMENT shall have the meaning set forth in Paragraph 12 of the Agreement.

(xiv)    QUARTERLY PREMIUM AVAILABILITY DATE shall have the meaning set forth in Paragraph 10 of the Agreement.

(xv)    QUARTERLY TRANCHE PREMIUM shall have the meaning set forth in Paragraph 10 of the Agreement.

(xvi)    REVOLVING ADVANCE shall have the meaning set forth in Paragraph 1 of the Agreement.

(xvii)    SCHEDULE A shall have the meaning set forth in Paragraph 6 of the Agreement.

(xviii)   SECOND TRANCHE (and/or another other NUMBERED TRANCHE) shall have the meaning set forth in Paragraph 5 of the Agreement.

(xix)    TRANCHE shall have the meaning set forth in Paragraph 2 of the Agreement.

(xx)    TRANCHE INITIATION DATE shall have the meaning set forth in Paragraph 5 of the Agreement.

(xxi)    TRANCHE MATURITY DATE shall have the meaning set forth in Paragraph 19 of the Agreement.

(xxii)   TRANCHE MATURITY REPAYMENT AMOUNT shall have the meaning set forth in Paragraph 20 of the Agreement.

(xxiii)  TRANCHE PRINCIPAL AMOUNT shall have the meaning set forth in Paragraph 5 of the Agreement.

(xxiv)  TRANCHE REVISED PRINCIPAL AMOUNT shall have the meaning set forth in Paragraph 13 of the Agreement.

(xxv)   VETO RIGHT shall have the meaning set forth in Paragraph 8 of the Agreement.

-EXHIBIT I-
Page 123

<u>WIRE TRANSFER INFORMATION</u>

       40.    Any wire transfer made to the Company in connection with, or otherwise under, this Agreement, shall be made by wire transfer.

       41.    This Agreement may be executed and delivered in counterparts, including by PDF e-mail, each of which shall be deemed to be an enforceable original and all of which together shall constitute one enforceable instrument.

       IN WITNESS WHEREOF, the Company and the Capital Provider have duly executed and delivered this Agreement as of the date first above written.

As for the Company:
**Base FX Productions Switzerland AG**

_____

Name:  Kevin Robl
Title:   CEO

As for the Capital Provider:
**Base Media Capital Singapore Pte Ltd**

_____

Name:  Stephen Ho
Title: Managing Director

# SCHEDULE A

*(See following pages)*



-EXHIBIT I-
Page 125

**TRANCHE #1**

Tranche Initiation Date: 1st August 2020

Tranche Principal Amount: SGD 750,000.00

Acknowledgement of receipt:

_____

Base FX Productions Switzerland AG
Name: Kevin Robl
Title: CEO

**TRANCHE #2**

Tranche Initiation Date: 1st Oct 2020

Tranche Principal Amount: SGD 400,000.00

Acknowledgement of receipt:

_____

Base FX Productions Switzerland AG
Name: Kevin Robl
Title: CEO

**TRANCHE #3**

Tranche Initiation Date: 1st Nov 2020

Tranche Principal Amount: USD 250,000.00

Acknowledgement of receipt:

_____

Base FX Productions Switzerland AG
Name: Kevin Robl
Title: CEO