UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BASE MEDIA TECHNOLOGY GROUP LIMITED,<br><br>      Plaintiff,<br><br>v.<br><br>REMINGTON "BILL" CHASE et al.,<br><br>      Defendants. | Case No. 2:22-cv-01954-SB-E<br><br>ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION [DKT. NO. 56] |

      Plaintiff Base Media Technology Group Limited alleges that Defendants Remington "Bill" Chase and Kevin Robl fraudulently used Plaintiff's name and forged its CEO's signature to obtain tens of millions of dollars in funding from investors who believed they were contracting with Plaintiff. Plaintiff now seeks to preliminarily enjoin Defendants from entering into further contracts or business activities using Plaintiff's name. Dkt. No. 56. Neither Chase nor Robl, nor any of the numerous entity Defendants that they allegedly control, has appeared or opposed the motion either in writing or at the hearing on September 30, 2022.[1] On the undisputed record before the Court, Plaintiff is entitled to the preliminary injunction it seeks, but only as to Defendants Chase and Robl.

I.

      Plaintiff, a Hong Kong corporation with offices in China and Malaysia, is one of the leading visual effects studios in Asia. Dkt. No. 56-2 ¶ 2 (decl. of Christopher Bremble). Plaintiff was founded in 2008 and has provided services on popular movies and television shows, winning three Emmys. *Id.* ¶ 3. Plaintiff's business is capital-intensive, requiring the use of special effects studios costing

---

[1] Plaintiff appeared at the hearing and submitted on the Court's tentative opinion.

1

millions of dollars. *Id*. Plaintiff had to seek investments and loans to expand its business and fund new projects. *Id*.

In 2013, Plaintiff's CEO, Christopher Bremble, met Defendant Chase. *Id*. ¶ 4. Chase was a former child actor and a well-known "bridge financier" in the film industry. *Id*. Plaintiff's Hollywood agent and others in the industry vouched for Chase. *Id*. Chase flew Bremble to meetings in his private jet and introduced Bremble to celebrities. *Id*. ¶ 5. In 2017, Plaintiff began a business relationship with Chase, who provided loans to fund a movie Plaintiff co-produced. *Id*. ¶ 6. After Chase's success in obtaining financing, Plaintiff decided to partner with him in building a new visual effects studio in Malaysia. *Id*. ¶ 7. Chase represented to Bremble that he had his own capital to invest and could raise additional funds through various companies he owned. *Id*. Plaintiff's complaint, motion, and evidence group together seven of the Defendant companies—Production Capital Corporation, Production Capital, LLC, Production Capital Entertainment, Inc., Friends of Production Capital, LLC, Friends of Production Capital II, LLC, Pre Production Capital, LLC, and Production Capital Legacy Partners Fund, LP—and refer to them collectively as "Defendant Production Capital" without distinguishing among their acts. Dkt. No. 1 at 1; Dkt. No. 56-1 at 1; Dkt. No. 56-2 ¶ 7. Chase represented that he had used these companies to raise funds for others in the past. Dkt. No. 56-2 ¶ 7.

Plaintiff entered into a joint venture with Chase to build the Malaysian studio, and in 2017, Chase, "through Defendant Production Capital," committed to fully fund construction and operational costs in exchange for majority ownership of the venture. *Id*. Chase soon began falling behind the financing schedule, and in 2018 told Plaintiff that "Production Capital" would ramp up fundraising efforts. Around this time, Defendant Robl's name began appearing in "Production Capital's" documents, and Chase explained that Robl ran the company for him. *Id*. ¶ 8. Based on Chase's and Robl's representations, Bremble believed that "Production Capital" was borrowing funds directly from lenders and then providing them to Plaintiff under separate arrangements. *Id*. Chase "continually assured" Bremble that the investors were contracting with "Production Capital" and not Plaintiff. *Id*. ¶ 11.

Around January 2019, Plaintiff began receiving wire transfers from other entities, some of which were unknown to Plaintiff's employees, and some of which included entities with unauthorized versions of Plaintiff's name, such as Base FXD ART Production, LLC. *Id*. ¶ 12. When Bremble asked about these transfers,

> Chase and Robl told [him] that these were funds meant to cover Defendant Production Capital's obligations to Base. Chase reassured [Bremble] that although new names were appearing, all the funds came from loans by parties to Defendant Production Capital, with certain funds sent directly to Base for expediency. Similarly, Chase explained the use of Base's name on wire receipts was merely for tracking purposes, since Chase, Robl, and Defendant Production Capital were raising money for multiple investments. Chase never told [Bremble] that he was telling investors they were investing directly in Base or its film projects.

*Id*.

Plaintiff continued to receive investments from Defendants, and in July 2019, an investor contacted Plaintiff seeking repayment of funds purportedly loaned to Plaintiff. *Id*. ¶ 14. Bremble was unaware of any such loan agreement and asked Chase about it. *Id*. Chase assured him that it was a miscommunication that would be addressed with the investor. *Id*. Because Bremble did not hear anything further about it, he believed the misunderstanding had been resolved. *Id*.

In December 2019, Plaintiff finalized a deal with a new investment partner unrelated to Defendants, which purchased a majority ownership interest in Plaintiff. *Id*. ¶ 16. The new investor's diligence process did not discover any evidence of fraud by Chase and Robl. *Id*. Defendants continued providing financing to Plaintiff through early 2020. *Id*. ¶ 19. That fall, Robl negotiated an agreement to buy an ownership interest in one of Plaintiff's films but ultimately refused to complete the transaction and walked away after obtaining confidential information about the project and its financing structure. *Id*. ¶ 20.

Plaintiff finally realized that Chase and Robl had been engaging in a fraudulent scheme in November 2020, when an investor called to ask about a $4 million loan it had wired to "a fake Base entity" in Switzerland earlier that year. *Id*. ¶ 21. No such funds had been reported or provided to Plaintiff. *Id*. Plaintiff then discovered that Chase and Robl had created the Swiss entity, using Plaintiff's name. *Id*. ¶ 22. Bremble confronted Chase and Robl, who "immediately assured [him] that they would repay their investors and shut down the Fake Base Switzerland entity." *Id*.

In the following months, "[c]alls and emails began to stream in from people who had been duped by Chase, Robl, and Defendant Production Capital,

demanding repayment on loans they thought had been made to Base." *Id*. ¶ 23. The lenders presented Plaintiff with "documents Chase and Robl had given them, which purported to have been signed by someone at Base, but in every case, bore [Bremble's] forged signature or forged signatures of others at Base." *Id*. The forgeries purported to show millions of dollars of loans taken out in Plaintiff's name and backed by Plaintiff's assets, with some purporting to grant percentages of revenue streams and equity interests in Plaintiff's film projects. *Id*.

Plaintiff now faces demands for repayment of many millions of dollars, with at least one demand to repay more than $100 million from a fund nobody at Plaintiff had ever heard of, based on forged agreements with Plaintiff. *Id*. ¶ 24. In October 2021, detectives visited Plaintiff's Beijing office, met with Bremble on multiple occasions, and verified that his purported signatures on the fraudulent investment agreements were forgeries. *Id*. ¶ 26.

Upon discovering the fraud, Bremble confronted Robl, who apologized and promised to pay back the funds and ensure that Base would not be responsible for any of the loans. *Id*. ¶ 25.[2] But the fraud did not stop. In November 2021, Plaintiff learned that Chase and Robl had participated in setting up an unauthorized office in California bearing Plaintiff's logo, which they used to lure film investors to make additional fraudulent investments. *Id*. ¶ 27. In January 2022, Plaintiff learned from a defrauded investor that Chase and Robl had been using fake Base email accounts to communicate with investors. *Id*. ¶ 28.

Plaintiff filed this action in March 2022, alleging claims for (1) fraud, (2) fraudulent inducement, (3) trade name infringement, (4) trade libel, (5) breach of a 2019 loan agreement between Plaintiff and Chase, (6) breach of a December 2019 agreement clarifying the relationship between Plaintiff and Chase's companies, (7) civil conspiracy, and (8) declaratory judgment. Dkt. No. 1. Plaintiff sued Chase, Robl, the seven Defendants collectively described as "Production Capital," and eight other entity Defendants allegedly controlled by Chase and Robl. Plaintiff later voluntarily dismissed its claims against three Defendants: Base FXD Art Production LLC, Base Productions Trinidad, and

---

[2] Bremble states that he "immediately" confronted Robl. By his own account, however, he first discovered the fraud in November 2020, he became aware of the $100 million transaction in August 2021, and Robl's response—which was apparently sufficiently prompt to dissuade Bremble from taking other action—was in a November 2021 text message.

Production Capital Corporation.  Dkt. Nos. 57, 58, 59.  None of the remaining Defendants has appeared, and default has been entered against most of them.

Since filing suit, Plaintiff has continued to hear from investors and potential investors indicating that Chase and Robl continue to solicit funds for purported projects of Plaintiff, and it appears that they are both "on the run and cannot be located."  Dkt. No. 56-2 ¶¶ 29–30.  Plaintiff fears further damage to its reputation, projects, and investors, and therefore seeks to preliminarily enjoin Defendants from continuing to use Plaintiff's name or make representations of any relation to Plaintiff to pursue contracts, fundraising, or other business activities.  Dkt. No. 56.

II.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  In the Ninth Circuit, a preliminary injunction may issue where there are "serious questions going to the merits" and a "hardship balance that tips sharply toward the plaintiff," provided the other two elements of the *Winter* test are also met.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  Because of the extraordinary nature of injunctive relief and the potential for irreparable injury if it is not granted, a district court determining whether to issue a preliminary injunction may consider evidence outside the normal rules of evidence, including hearsay.  *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

III.

A.

Plaintiff seeks to preliminarily enjoin all Defendants from "entering into or pursuing any contracts, fundraising, or other business activities using the Base name, including representing any relation to Base or its affiliates, employees, officers, directors, or agents" or "using Base's name or trademark or inferring a relationship with Base or its affiliates, employees, officers, directors, or agents, in any marketing, advertising, fundraising, or other transaction, either professional or personal."  Dkt. No. 56-4 at 2 (proposed order).  This request is problematic as to the entity Defendants for several reasons.  First, Plaintiff only purports to have served its motion on Defendants Chase and Robl.  Dkt. No. 56-5 (proof of

service).³  *See* Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

Second, the claims on which Plaintiff argues it is likely to succeed are not alleged against all Defendants.  Plaintiff's claims for fraud (Count 1) and trade name infringement (Count 3) are alleged against Defendants Chase, Robl, and "Production Capital," Dkt. No. 1 ¶¶ 88–97, 110–115, and its claims for breach of contract (Counts 5 and 6) are alleged only against Chase, *id*. ¶¶ 123–134.  Thus, Plaintiff has not even attempted to show a likelihood of success on the merits of any claims against the entity Defendants, other than the seven that compose "Production Capital."

Finally, Plaintiff's global allegations and references to "Production Capital" are insufficient to establish a likelihood of success on the merits or otherwise show that an injunction is warranted against any of the specific Defendants that Plaintiff lumps together.  Indeed, Plaintiff fails to identify any action whatsoever taken by any particular entity Defendant.  For all these reasons, Plaintiff has not shown that it is entitled to a preliminary injunction against any Defendants other than Chase and Robl.⁴

B.

As to Chase and Robl, Plaintiff is entitled to a preliminary injunction.  The first *Winter* factor, likelihood of success on the merits, is the most important.  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).  Plaintiff argues that it has shown a likelihood of success on the merits of its claims for fraud, trade name infringement, and breach of contract.  A showing of likelihood

---

³ Chase and Robl, who have not appeared, were served by email as authorized by the Court.  *See* Dkt. No. 52 at 2 n.2 ("In addition to service of process, Plaintiff may serve any subsequent filings on Chase and Robl by email until they appear in this case or until further order of the Court.").

⁴ The injunction against Chase and Robl will prohibit them from using Plaintiff's name or suggesting affiliation with Plaintiff both individually and through any entities they control.  *See* Fed. R. Civ. P. 65(d)(2) (injunction may bind persons who have actual notice of injunction and are in active concert or participation with parties bound).  Thus, to the extent Plaintiff is correct in conclusorily alleging that the entity Defendants are alter egos for Chase, narrowing the injunction in this way should have little practical effect.

of success on any of these claims is sufficient. *See Marilley v. McCamman*, No. C-11-02418-DMR, 2011 WL 4595198, at *2 (N.D. Cal. Oct. 3, 2011) ("In order to obtain a preliminary injunction, Plaintiff must establish a likelihood of success on the merits . . . of at least one of his three claims.").

Plaintiff is likely to succeed on the merits of its fraud claim against Chase and Robl. Under California law, fraud requires (1) a false representation, (2) knowledge of its falsity, (3) intent to defraud, (4) justifiable reliance, and (5) damages. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Plaintiff produces evidence that Chase and Robl repeatedly made false representations to Plaintiff about the nature of the loans they were obtaining for Plaintiff, to induce Plaintiff to continue its relationship with Defendants and to cover up Defendant's ongoing fraud against investors.[5] Because Plaintiff relied on Chase's and Robl's assurances, it did not immediately investigate and intervene in their scheme. As a result, its reputation was further harmed, and it faces claims from more defrauded investors who believed they loaned money to Plaintiff and expect repayment.

Plaintiff has also shown a likelihood of success on its claim for trade name infringement. It is unclear from Plaintiff's complaint whether this claim arises under federal or California law. Plaintiff invokes only diversity jurisdiction, not federal-question jurisdiction, which suggests a state-law claim, but the cases it cites in its motion address infringement under the federal Lanham Act. The difference appears to be immaterial for purposes of this motion. *See Century 21 Real Est. Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988) (stating that under both federal and California law, the "crucial issue" for trademark infringement claim is "whether the defendant's use of the plaintiff's service mark or trade name creates a 'likelihood of confusion' for the public"); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534–36 (9th Cir. 1989) (explaining that although trademarks and trade names are technically distinct, they both receive essentially the same protection under the same test for likelihood of confusion). Plaintiff's uncontroverted evidence suggests that Chase and Robl used its well-known name

---

[5] Plaintiff's motion at times appears to conflate Defendants' defrauding of Plaintiff and Defendants' defrauding of investors. Plaintiff's fraud claim depends on the former; it has not shown that it can recover on a fraud claim based on misrepresentations made to third-party investors.

to impersonate Plaintiff and convince investors that they were making loans to Plaintiff.[6]

The second and third *Winter* factors also favor injunctive relief.  Plaintiff has shown that it is likely to be irreparably harmed by continued infringement and fraudulent use of its trade name.  Irreparable harm may not be presumed based solely on a likelihood of success in a trademark action, but evidence of loss of control over business reputation and damage to goodwill can constitute irreparable harm.  *Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013).  Plaintiff produces evidence that Chase and Robl continue to use its name to defraud investors, which plainly damages Plaintiff's reputation and goodwill.  Because these harms are not readily compensable by an award of money damages, Plaintiff has shown a likelihood of irreparable harm in the absence of an injunction.  Nor have Chase and Robl shown that they have any legitimate interest in continuing to use Plaintiff's name or their business relationship with Plaintiff to defraud investors.  *See VidAngel*, 869 F.3d at 867 ("[H]arm caused by illegal conduct does not merit significant equitable protection.").  Thus, any hardship to Defendants caused by an injunction is heavily outweighed by the risk of irreparable harm Plaintiff faces if Defendants' fraud and infringement is not enjoined.

Finally, the public interest favors issuance of an injunction to stop Defendants' fraud.  "An injunction that prevents consumer confusion in trademark cases . . . serves the public interest."  *Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co.*, 534 F. App'x 633, 636 (9th Cir. 2013) (citing *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 (9th Cir. 2009)).

Because all four *Winter* factors favor Plaintiff, a preliminary injunction enjoining further use of Plaintiff's name or suggestions of association with Plaintiff is appropriate.

C.

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper

---

[6] Because Plaintiff has shown a likelihood of success on the merits of its fraud and trade name infringement claims, it is unnecessary to consider its breach of contract claims, which are alleged only against Chase.

to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Rule 65(c) vests the district court with discretion as to the amount of security required and allows the court to dispense with the filing of a bond altogether if it concludes that there is no realistic likelihood of harm to the defendant from enjoining his conduct. *Johnson*, 572 F.3d at 1086. The Court agrees with Plaintiff that the requested injunction, which seeks only to prevent Chase and Robl from fraudulently using Plaintiff's name or suggesting affiliation with Plaintiff, is unlikely to cause any legitimate loss to Defendants. The Court therefore will not require a bond.

IV.

Accordingly, the Court GRANTS Plaintiff's motion for a preliminary injunction as to Defendants Remington "Bill" Chase and Kevin Robl and DENIES the motion as to the other Defendants. Defendants Chase and Robl are preliminarily enjoined from and shall immediately cease and desist:

1. entering into or pursuing any contracts, fundraising, or other business activities using the Base name, including representing any relation to Plaintiff Base Media Technology Group Limited or its affiliates, employees, officers, directors, or agents; and

2. using Plaintiff's name (in whole or in part) or inferring a relationship with Plaintiff or its affiliates, employees, officers, directors, or agents, in any marketing, advertising, fundraising, or other transaction, either professional or personal.

This injunction prohibits Defendants Chase and Robl from undertaking the above actions either directly or indirectly through any third party, including any companies or entities they control.

Plaintiff shall promptly serve a copy of this order on Defendants Chase and Robl by email at the email addresses previously authorized by the Court.

IT IS SO ORDERED.

Date: October 3, 2022

Stanley Blumenfeld, Jr.
United States District Judge